UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------- x

LEHIGH UNIVERSITY,                                                    :

                            Plaintiff          :

                            -against-          :

ALLIANZ GLOBAL INVESTORS U.S. LLC,                                   :
and ALLIANZ SE                                                       :

                           Defendants.        :

-------------------------------------------------------------------- x

Civil Action No.: 1:20-cv-7061

**COMPLAINT**

**DEMAND FOR JURY TRIAL**

**ECF CASE**

## TABLE OF CONTENTS

NATURE OF THE ACTION ....................................................................................1

PARTIES ................................................................................................................5

JURISDICTION AND VENUE ...............................................................................6

FACTUAL ALLEGATIONS ...................................................................................6

I.    Allianz SE Controls and Operates a Globally Integrated Group of Investment Managers with Common Risk Management Supervision ...............................................................................................6

    A.    Allianz SE Controls AllianzGI and Its Affiliates .......................6

    B.    Allianz SE Provides Integrated Risk Management for All Allianz Global Investors Affiliates ............................................11

II.    AllianzGI's Structured Alpha Portfolio ...................................................12

III.    Lehigh's Investment Objectives ...............................................................13

IV.    Lehigh's Investments in the Funds ..........................................................14

V.    Lehigh Paid AllianzGI to Manage the Funds ..........................................15

    A.    AllianzGI Serves as Both the Managing Member and Investment Manager for the Funds and, by Contract, Is Not Exculpated from Its Own Negligence ...............................15

    B.    AllianzGI Earned Only a Performance-Based Management Fee Paid Directly by Each Investor ............................................16

VI.    AllianzGI's Representations About the Structured Alpha Strategy and Risk ....................................................................................................17

    A.    AllianzGI's Representations Concerning its Investment Strategy ......................................................................................18

        1.    AllianzGI Represented in Its PPMs and Marketing Documents That the Funds Were Designed to Protect Against a Market Crash ....................................18

        2.    AllianzGI's Representations About the Funds' Strategy in Presentations to Lehigh ...............................24

            3.      AllianzGI's Representations About the Funds'
                    Strategy in Quarterly Updates..........................................................26

      B.      AllianzGI's Representations Concerning the Funds' Risk
              Profile........................................................................................................27

      C.      AllianzGI's Representations Concerning its Risk
              Management.............................................................................................30

      D.      AllianzGI's Meetings with Lehigh Confirmed and
              Reinforced Its Written Representations about Strategy
              and Risk ....................................................................................................32

VII.   AllianzGI, Unbeknownst to Lehigh, Altered the Funds' Strategy
       and Risk Profile...........................................................................................34

      A.      AllianzGI Unilaterally Changed Its Investment Strategy ..........................34

      B.      AllianzGI Unilaterally Elevated the Funds' Downside Risk....................35

VIII.  Lehigh's 2019 Investments in the Global Fund........................................36

IX.    AllianzGI Knowingly or Recklessly Misrepresented and Omitted
       Material Information Regarding the Funds' Strategy and Risk
       after March 2019..........................................................................................37

      A.      AllianzGI's False Statements Following Its Undisclosed
              Directional Bet.........................................................................................39

      B.      AllianzGI Failed to Disclose That the Funds Were Not
              Directionally Neutral ...............................................................................40

      C.      AllianzGI Knew or Was Reckless in Not Knowing That Its
              Representations Were False or Materially Misleading.............................41

X.     Lehigh's Reliance on AllianzGI's Representations Was Reasonable ..................43

XI.    Allianz SE Controlled IDS and AllianzGI US and Culpably
       Participated in Their Misconduct..............................................................44

XII.   AllianzGI Admits that it Misrepresented the Funds' Strategy............................46

      A.      AllianzGI Reveals that the Funds Were Structured to Be
              Short Volatility.........................................................................................46

      B.      AllianzGI Admits That the Funds' Downside Risk Was
              Much Higher Than Previously Reported ...................................................48

|  | C. | AllianzGI Admits that its Risk Management Was Inadequate | 48 |

| XIII. | | AllianzGI Blunders in Response to the Coronavirus Market Downturn | 50 |
|  | A. | AllianzGI Ignored Its Own Chief Economist and, Disastrously, Bets on a Market Rebound | 50 |
|  | B. | AllianzGI's Management Fee Structure Incentivized Its Gamble | 52 |
|  | C. | AllianzGI Ignored Lehigh's Pleas to Execute the Funds' Stop-Loss Protections | 53 |
| XIV. | | AllianzGI's Misconduct Caused Lehigh Substantial Losses | 55 |

PRAYER FOR RELIEF ................................................................74

JURY DEMAND ........................................................................74

Plaintiff Lehigh University ("Lehigh"), by its attorneys Schindler, Cohen & Hochman LLP, as and for its Complaint against Defendants Allianz Global Investors U.S. LLC ("AllianzGI") and Allianz SE (together, with AllianzGI, "Allianz" or "Defendants") alleges as follows:

## NATURE OF THE ACTION

1.      Lehigh is a non-profit private research university that had sought to invest part of its portfolio in investment strategies with high predictability and low active risk. Between 2013 and 2019, Lehigh invested more than $67 million of its total portfolio in two funds offered and managed by AllianzGI that purported to utilize such a strategy: the AllianzGI Structured Alpha U.S. Equity 500 LLC (the "U.S. Fund") and the AllianzGI Structured Alpha Global Equity 500 LLC (the "Global Fund," and together with the U.S. Fund, the "Funds").

2.      Lehigh made these investments in reliance on AllianzGI's core and often-repeated assurances that it used sophisticated options strategies to protect against a market crash and generate uncorrelated returns, independent of market direction or volatility.  However, when COVID-19 battered the financial markets in February and March 2020, AllianzGI admitted that it had abandoned key components of its strategy, thereby rendering its prior representations to Lehigh materially false or misleading and exposing its investors to unexpected and unacceptable risk.

3.      AllianzGI also drastically mismanaged the Funds in the face of the 2020 market dislocation and the losses occasioned by disregarding its professed strategy. Jettisoning its touted market discipline and stop-loss procedures, AllianzGI scrambled to recoup its losses by wagering on the markets' direction and volatility — precisely what it

had promised never to do.  It guessed wrong as to both, and the combination of its

misrepresentations and negligence wiped out more than 75% of Lehigh's investments in

the Funds — more than $62 million — during the first quarter of 2020.

4.     More specifically, Lehigh invests a portion of its portfolio — consisting of

its endowment and university assets — in "portable alpha" strategies.  These types of

investment strategies seek to separate market risk (known as "beta") from active returns

(known as "alpha").  While the beta component is passively managed to track broad

market benchmarks, the alpha component is actively managed to provide investors with

an uncorrelated but well-defined return — in exchange for well-defined and limited risk.

Because the source of alpha is independent of the desired market exposure, it can

theoretically be utilized with any type of market exposure.  These investment strategies

generally possess a high level of predictability and, therefore, low active risk (called

"tracking error") due to tight risk management guidelines imposed on the underlying

mandates.  While these strategies at times exhibit both positive and negative returns,

when properly implemented, they are constrained to a narrow range of returns around a

benchmark based on market performance.

5.     AllianzGI advertised that its proprietary strategy, which it called

"Structured Alpha," had a "three-pronged objective":  "(1) to profit during normal market

conditions; **(2) *to protect against a market crash***; and (3) to navigate as wide a range of

equity-market outcomes as possible."  (Emphasis added.)

6.     AllianzGI regularly and repeatedly represented over the course of more

than six years that it "protect[ed]" against a market crash by always holding ample

quantities of long put options at various prices.  Indeed, the protections afforded by these

long puts were supposedly **"a cornerstone of Structured Alpha's investment process."** (Emphasis added.)

7.    AllianzGI also assured Lehigh that it would **"never make a forecast on the direction of equities or volatility."** (Emphasis added.) In essence, AllianzGI represented that it had engineered an options strategy with cabined risk that did not involve its predicting either market movements or volatility.

8.    AllianzGI also claimed that the Structured Alpha strategy was tested, vetted, and monitored by a robust two-level risk management system, including the swift engagement of stop-loss orders that would effectively protect against serious losses.

9.    In reliance on these representations, as well as various portfolio analyses and monthly risk reports AllianzGI provided to Lehigh—all of which depicted portfolios consistent with AllianzGI's representations—Lehigh continued to invest and retain its prior investments in the Funds through the beginning of 2020.

10.    However, by April 2019, confronted with sluggish Fund performance due to stable market conditions, AllianzGI, unbeknownst to Lehigh, abandoned its tightly risk-managed options strategy in favor of a risky gamble that the market would continue to trend upwards and volatility would remain low. In doing so, AllianzGI severely impaired much of the downside protection that it had represented would remain in place "at all times," including the investment positions that hedged against market decline and volatility.

11.    AllianzGI's undisclosed change in strategy drastically altered the Funds' risk profile. By early 2019, and contrary to AllianzGI's representations, the Funds (a) held options portfolios with significant unprotected downside risk, (b) were highly

3

correlated to market swings, and (c) generally required neutral or bullish markets to generate positive returns.

12.     These characteristics rendered the Funds completely unsuitable for Lehigh's investment objectives.  As Lehigh's longstanding investment manager, AllianzGI knew this, yet intentionally or recklessly concealed these facts from Lehigh to induce it to continue investing in the Funds.

13.     By late January 2020, fears that COVID-19 could significantly impact the global economy became widespread.  AllianzGI shrugged off these concerns and even ignored the warnings of a downturn issued by Allianz SE's own chief economist, standing pat with its risky bet.

14.     To make matters worse, when the Funds began to lose value in February 2020, AllianzGI failed to take steps to mitigate the damage done by its changed strategy. It ignored Lehigh's pleas to implement its vaunted risk management and stop-loss mechanisms.  Instead, it doubled-down on its directional and volatility bets, gambling that the market would recover quickly.  It did not, and each of the Funds lost more than 75% of their value.  These losses far outstripped the corresponding average market decline of less than 20% during the same period and were directly caused by AllianzGI's misrepresentations and blatant mismanagement.

15.     It was only after conversations with AllianzGI following unexpectedly poor February performance that Lehigh learned AllianzGI had lied about its investment strategy since March or April 2019, placing a previously undisclosed directional bet with its options portfolio to inflate the Funds' returns—and AllianzGI's incentive fees.

16.     Ultimately, Lehigh lost approximately $62.5 million of its investment during the first quarter of 2020 as a direct result of AllianzGI's numerous misrepresentations about the Funds' strategy and risk control mechanisms and its gross mismanagement of Lehigh's investments.  AllianzGI's misconduct gives rise to causes of action for, *inter alia*: securities fraud under Rule 10b-5, common law fraud, negligent misrepresentation, breach of fiduciary duty, negligence, and breach of the implied covenant of good faith and fair dealing.

## PARTIES

17.     Plaintiff Lehigh University is a private, non-profit research university with its principal place of business at 27 Memorial Drive West, Bethlehem, Pennsylvania 18015.  Founded in 1865, Lehigh has an annual enrollment of nearly 7,000 undergraduate and graduate students from 93 countries.  It is one of the United States' most distinguished private research universities and, based on its numerous United Nations-related programs, Lehigh is one of six universities recognized by the United Nations as a non-governmental organization (NGO).

18.     Defendant Allianz Global Investors U.S. LLC is a Delaware limited liability company with its principal place of business at 1633 Broadway, New York, New York 10019.  AllianzGI is an investment advisor registered with the SEC and it is 100% directly owned by Allianz Global Investors U.S. Holdings LLC ("AllianzGI Holdings").  AllianzGI Holdings is a wholly-owned subsidiary of PFP Holdings, which is indirectly wholly-owned by Defendant Allianz SE.

19.     Defendant Allianz SE is a multinational financial services holding company incorporated and headquartered in Germany.  Allianz SE refers to itself and its

subsidiaries as the Allianz Group and holds itself out to be a unified, global financial services firm. Allianz SE indirectly owns 100% of AllianzGI.

## JURISDICTION AND VENUE

20.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332, because Lehigh is a citizen of Pennsylvania, AllianzGI is a citizen of New York, Allianz SE is a citizen of Germany, and the amount in controversy, exclusive of interests and costs, exceeds the sum or value of $62,467,459.90.

21.    This Court also has subject matter jurisdiction over this action under Section 27 of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78aa(a), and 28 U.S.C. § 1331, as the claims alleged herein arise under Section 10(b) of the Exchange Act, Rule10b-5 promulgated thereunder, and Section 20(a).

22.    This Court also therefore has supplemental jurisdiction over Plaintiff's claims for fraud, negligent misrepresentation, breach of fiduciary duty, negligence, and breach of the implied covenant of good faith and fair dealing.

23.    Venue is proper because AllianzGI's principal place of business is in New York, New York and because the parties contractually consented to submit their disputes to the U.S. District Court for the Southern District of New York.

## FACTUAL ALLEGATIONS

**I.    Allianz SE Controls and Operates a Globally Integrated Group of Investment Managers with Common Risk Management Supervision**

### A.    Allianz SE Controls AllianzGI and Its Affiliates

24.    Allianz SE is the parent holding company for the Allianz Group, "a global financial services provider with services predominantly in the insurance and asset management business."

6

25.     Allianz SE presents itself and its subsidiaries as a single entity that operates on a worldwide basis, without regard to geographic or jurisdictional boundaries. According to its marketing materials, Allianz SE's "corporate purpose . . . is the direction of an international group of companies" and it "runs its operating entities and business segments via an integrated management and control process."

26.     The asset management business segment of Allianz SE brands itself as "Allianz Global Investors."  Allianz Global Investors "operates through affiliated entities throughout the world."  At all relevant times between 2013 and the present, AllianzGI was an indirect, wholly-owned subsidiary of Allianz SE operating within the Allianz Global Investors brand.

27.     In keeping with Allianz SE's integrated structure, Allianz Global Investors strategically and intentionally presents itself "[a]s a globally integrated investment manager," with over $560 billion in assets under management, and employing more than 2,700 people across 25 locations.  According to Allianz Global Investors, "its global investment platform brings together professionals across asset classes and investment styles, enabling them to collaborate on unique insights for clients while maintaining distinct investment processes."  As one illustration of the integrated nature of Allianz Global Investors, all of its affiliates, including AllianzGI, share the exact same logo.

28.     Furthermore, Allianz Global Investors defines itself as a group of entities that "coordinate their research, investment, and/or trading activities," qualifying as a "firm" under the Global Investment Performance Standards ("GIPS"), a set of international standards governing the disclosure and representation of investment firm results.

29.     Consistent with these representations, AllianzGI stated in its SEC disclosures that its Allianz Global Investor affiliates are "related persons" or "control persons," and that it coordinates certain investment activities with such affiliates. AllianzGI further disclosed that it shares with these affiliates certain employees and services, including those in the areas of legal and compliance, risk management, human resources, finance, information technology, trade support, and sales and marketing. AllianzGI also disclosed that it delegates certain investment management-related responsibilities to its affiliates, for which it pays a portion of its investment management fees.

30.     AllianzGI and its affiliates comprising Alliance Global Investors were at all times controlled by, and agents of, Allianz SE.  Indeed, AllianzGI disclosed in its SEC filings that it and its affiliates are each directly or indirectly wholly-owned subsidiaries and "under common control" of Allianz SE.

31.     Allianz SE's control over AllianzGI and its affiliates is made apparent by the fact that Allianz SE relies on the business activities of the Allianz Global Investors subsidiaries in assessing its own financial status and solvency under applicable European insurance regulations.  For example, in its 2019 annual report, the Allianz Group presented consolidated financial statements that incorporated the financial statements of Allianz SE and all of its wholly-owned subsidiaries, including AllianzGI.  Additionally, according to Allianz Group's 2019 Solvency and Financial Condition Report, Allianz SE exercises a "dominant" influence, has 100% voting rights in and capital share with, and uses 100% of the financials of Allianz GI for the establishment of Allianz Group's

consolidated accounts and solvency calculation — confirming the ultimate control that Allianz SE exerts over AllianzGI.

33.      Further demonstrating control, the annual reports for Allianz Group and Allianz SE state that Allianz SE "steers its operating and business segments via an integrated management and control process" which "begins with the definition of a business-specific strategy and goals, which are discussed and agreed upon between [Allianz SE] and operating entities.  Based on this strategy, [Allianz SE's] operating entities prepare three-year plans which are then aggregated to form the financial plans for the business divisions and for the Allianz Group as a whole."

33.      Allianz SE's Supervisory Board and Board of Management directly oversee financial plans at a group-wide level.  The Supervisory Board "approves the plan and sets corresponding targets for the Board of Management," which is "responsible for setting business objectives and the strategic direction, for coordinating and supervising the operating entities, and for implementing and overseeing an efficient risk management system."

34.      Additionally, Deborah Zurkow, the Global Head of Investments at Allianz Global Investors, stated in an interview that one of the benefits of investing through an affiliate of Allianz Global Investors is that the group "sits inside a stable parent," which is particularly important given "investors' concern that the smaller hedge funds or alternative teams won't be able to maintain the kind of counter-party liquidity required if we hit a crisis."  This demonstrates that Allianz SE's support for the Allianz Group was an integral component of the group's marketing to investors and suggests that Allianz SE would provide liquidity to support the Funds in the event of a crisis.

35.     Beyond its marketing, AllianzGI's investment decisions and risk management are in fact supervised by the broader, integrated Allianz Group, which is ultimately controlled by Allianz SE.  Specifically, all affiliate entities of Allianz Global Investors, including AllianzGI, are overseen by committees variously described as the "Global Executive Committee," "Global Investment Management Committee," and "executive leadership team."  Allianz Global Investors represents that, "with respect to all investment matters, the responsibility for ensuring our approach is designed to meet our obligations to our clients rests with the Global Investment Management Committee."

36.     Executives who sit on these committees are employed by various entities directly or indirectly owned and controlled by Allianz SE.  Zurkow, for example, sits on the Global Executive Committee, and is employed by Allianz Global Investors GmbH, an affiliate of AllianzGI that is wholly-owned and controlled by Allianz SE.  In its SEC disclosures, AllianzGI represents Zurkow as an "associated person" of AllianzGI, because AllianzGI "uses the resources of Ms. Zurkow to provide portfolio management services to [its] clients."  Notably, the chief architect of the Funds at issue—Greg Tournant—is a managing director at AllianzGI and sits on AllianzGI's Executive Committee, but reports directly to Zurkow.

37.     Furthermore, the coordination of research, investment, and trading activities among affiliates of Allianz Global Investors is subject to "common supervision" by Allianz Global Investor's Global Chief Investment Officer.  Prior to January 2020, the Global Chief Investment Officer was Andreas Utermann, who was likewise employed by Allianz Global Investors GmbH.  Since January 2020, these supervision responsibilities have been split between Zurkow and Tobias Pross, the CEO

of Allianz Global Investors.  This chain of command illustrates that AllianzGI's activities are directly supervised and overseen by executives at the Allianz Group level and are subject to ultimate control by Allianz SE.

38.     Finally, in March 2020, after AllianzGI suffered the disastrous losses described herein—including the liquidation of two other, more aggressive Structured Alpha Funds: the Alpha Structured Alpha 1000 and Structured Alpha 1000 Plus—Allianz Global Investors announced that the CEO of AllianzGI, Douglas Eu, would leave the firm on June 30 after 14 years with Allianz.  Following his departure, Allianz Global Investors shifted some of his responsibilities to Malie Conway, the head of U.S. distribution, but announced that there would no longer be a U.S. CEO for AllianzGI. AllianzGI's lack of its own CEO further cements Allianz SE's ultimate control over AllianzGI.

**B.     Allianz SE Provides Integrated Risk Management for All Allianz Global Investors Affiliates**

39.     With respect to risk management in particular, Allianz SE specifically represents that,"[a]s a provider of financial services, we consider risk management to be a core competency and an integral part of our business. ***Our risk management framework covers all operations and subsidiaries within the Group in proportion to the inherent risk of their activities, ensuring that risks across the Group are consistently identified, analyzed, assessed, and managed.***"  (Emphasis added.)

40.     According to Allianz SE, it "closely monitor[s] the capital position and risk concentrations of the Group and its related undertakings and appl[ies] regular stress tests (including standardized, historical, and reverse stress test scenarios as well as

monthly stress and scenario analyses focusing on current and possible future developments)."

41.    Allianz Global Investors routinely advertises the robust risk management of Allianz SE and Allianz Group as a key benefit for its investors.  On its website, for example, Allianz Global Investors repeatedly markets the fact that it is "part of the Allianz Group" and "has a strong parent," Allianz SE, that "remains one of the world's strongest financial communities" and "continues to be a global leader in asset management services and solutions."  According to Allianz Global Investors, Allianz SE has "rock-solid risk management" and "a track record of strategic investment for the long term."

42.    Allianz SE's Board of Management is "responsible for setting business objectives and the strategic direction, for coordinating and supervising the operating entities, and for implementing and overseeing an efficient risk management system."

43.    In particular, Allianz SE represents that its "risk management framework covers all operations and subsidiaries within the group in proportion to the inherent risk of their activities, *ensuring that risks across the Group are consistently identified, analyzed, assessed, and managed*."  (Emphasis added.)

**II.    AllianzGI's Structured Alpha Portfolio**

44.    In addition to the Funds, AllianzGI manages a large portfolio of actively managed investment products.

45.    Until March 2020, this portfolio included other Structured Alpha products including Structured Alpha U.S. Equity 250 ("Alpha 250"), Structured Alpha Global

Equity 350 ("Alpha 350"), and Structured Alpha 1000 and Structured Alpha 1000 Plus (together, the "Alpha 1000 Funds").

46. All the Structured Alpha products shared a strategy of investing in a variety of option contracts for the purpose of outperforming the market while hedging against losses in the event of a market decline.

47. As with the Funds, the Alpha 250 Fund and Alpha 350 Fund also experienced massive losses in the first quarter of 2020 — -41.59% and -52.18%, respectively. Both substantially underperformed their reference indexes.

48. The Alpha 1000 Funds, with a return target of 10% above their benchmarks, also suffered huge losses in February and March 2020. Due to these losses, AllianzGI was forced to liquidate the Alpha 1000 Funds in March 2020.

### III. Lehigh's Investment Objectives

49. Lehigh has a total investment portfolio of approximately $1.6 billion consisting of both endowment and university assets. The university endowment ("Endowment") is Lehigh's largest tangible asset, and serves as a key source of funding for Lehigh each year, providing for scholarships, academic programs, and faculty endowed chairs. Lehigh's Endowment is a long-term perpetual asset, required to provide financial support to current and future generations of Lehigh students.

50. Because the Endowment is a critical source of funding for the university, the central objectives of Lehigh's investment policy are to protect and grow the Endowment. Lehigh carefully invests across a broad array of strategies and in a globally diversified mix of investment vehicles, including various investment funds, seeking returns sufficient to meet the university's current and future financial needs.

51.     Lehigh's investments in the Allianz Funds were intended to track their underlying market benchmarks with the options portfolio providing a modest incremental return over the life of the investment.  The expected tracking error — which measures the strategy's consistency compared to a benchmark — on the Funds was 3% to 5%, which positioned them as one of the more conservative investments in Lehigh's portfolio.

## IV.     Lehigh's Investments in the Funds

52.     Lehigh has had a long-standing relationship with AllianzGI.  In 2011, Lehigh invested $10 million in the AllianzGI Structured Alpha US Treasury Fund (the "Treasury Fund"), which sought to outperform the BofA Merrill Lynch Current 10-Year US Treasury Index by approximately 500 bps (basis points, *i.e.*, 5.0%), net of fees, using the same options strategy ultimately used by the Funds.

53.     In March 2013, Lehigh withdrew entirely from the Treasury Fund and invested $18,014,590.59 in the U.S. Fund.

54.     In 2015 and 2016, Lehigh invested an additional $14,000,000 in the U.S. Fund for a total of $32,014.590.50.  By March 2019, Lehigh's capital balance in the U.S. Fund had reached $67,047,810.28.

55.     Later in 2019, Lehigh withdrew $35,000,000 from the U.S. Fund and invested in the Global Fund, which employed the same options strategy as the U.S. Fund. Specifically, Lehigh made investments in the amount of $10,000,000; $10,000,000; $10,000,000; and $5,000,000 on March 1, 2019, April 1, 2019, May 1, 2019, and November 1, 2019, respectively.

V.     **Lehigh Paid AllianzGI to Manage the Funds**

    A.     **AllianzGI Serves as Both the Managing Member and Investment Manager for the Funds and, by Contract, Is Not Exculpated from Its Own Negligence**

    56.    Both the U.S. Fund and the Global Fund are structured as limited liability companies.  They are governed by the Fifth Amended and Restated Limited Liability Company Agreement of AllianzGI Structured Alpha U.S. Equity 500 LLC, dated as of December 31, 2017 ("U.S. LLC Agreement") and the Second Amended and Restated Limited Liability Company Agreement of AllianzGI Structured Alpha Global Equity 500 LLC, dated as of December 31, 2017 ("Global LLC Agreement," and with U.S. LLC Agreement, the "LLC Agreements").  They are substantially identical.

    57.    As an investor in the Funds, Lehigh owned an interest in, and was a member of, each limited liability company.

    58.    Section 8.20 of the LLC Agreements provides that the LLC Agreements are to be read in conjunction with the private placement memorandums for each fund ("PPMs").  The PPM for the U.S. Fund states that the investment objective of the U.S. Fund is to outperform Standard & Poor's 500 Composite Stock Index ("S&P 500") by approximately 5%, net of AllianzGI's management fees and expenses.  The PPM for the Global Fund likewise states that the investment objective for the Global Fund is to outperform the MSCI ACWI Investible Market Index ("MSCI ACWI") by approximately 5%, net of fees and expenses.

    59.    Pursuant to the LLC Agreements, AllianzGI served as both the Managing Member and the investment manager for each Fund.  Pursuant to Section 2.03 of the LLC Agreements, AllianzGI's duties in that capacity include, among other things: "(i) advising regarding the purchase and sale of investments; (ii) arranging financing for the

acquisition of investments and other assets and negotiating the terms of such financing;
(iii) conducting, or supervising third parties who conduct, investigations of the
investments and other assets that may be acquired; [and] (iv) managing the Company's
assets."

60.     Although fund documents often exculpate managers from mere
negligence, the LLC Agreements do not.  Pursuant to Section 2.06 of the LLC
Agreements, AllianzGI shall ***not be exculpated*** "for any acts or omissions arising out of
or in connection with the Company, any investment made or held by the Company or this
Agreement" if  "***such action or inaction*** was made in bad faith or ***constitutes*** willful
misconduct ***or negligence***."  (Emphasis added.)

### B.      AllianzGI Earned Only a Performance-Based Management Fee Paid Directly by Each Investor

61.     Under Section 2.08 of the LLC Agreements, AllianzGI is entitled to
collect a management fee, as set forth under the PPMs.  The PPMs provide that, rather
than a fixed fee, AllianzGI would earn an incentive fee equal to 30% of the excess capital
appreciation of each investor's capital account during each calendar quarter in which the
Fund exceeded the performance of the applicable benchmark indexes.

62.     For example, if the S&P 500 increased by 10% in a calendar quarter, and
the value of U.S. Fund increased by 12%, AllianzGI was entitled to 30% of the 2%
overperformance.

63.     However, AllianzGI received no fees for the management of a Fund if the
Fund underperformed the applicable benchmark index.

64.     Furthermore, pursuant to the Funds' LLC Agreements, AllianzGI was
required to recover the amount of any underperformance through overperformance in

future quarters before it could begin receiving fees again.  The amount by which the Funds underperformed their respective benchmark indexes at the end of a calendar quarter was added to a "Recovery Account."  AllianzGI received no management fees unless the value of the "Recovery Account" was zero.  If the Recovery Account was greater than zero, any overperformance amount at the end of a calendar quarter would be subtracted from the Recovery Account until it reached zero.  Upon reaching zero, AllianzGI would be entitled to begin receiving performance fees again on any end-of-quarter overperformance.  Therefore, if the Funds experienced substantial underperformance, the resulting substantial increase in the Recovery Account amount would need to be offset by massive overperformance before AllianzGI could begin to receive fees again.

65.     This is a relatively unusual compensation scheme for a fund manager.  A more typical fee arrangement includes both a fixed percentage of assets under management, often 2%, and an incentive component, often 20%.  Compared to the standard "two and twenty" fee structure, this structure placed additional emphasis on the Funds' performance.

66.     Pursuant to Section 3.04 of the LLC Agreements, AllianzGI established separate capital accounts for each investor in the Funds.  From its capital account, Lehigh paid a management fee directly to AllianzGI consistent with and pursuant to Section 2.08 of the LLC Agreements.

VI.   **AllianzGI's Representations About the Structured Alpha Strategy and Risk**

67.     As Lehigh's long-standing investment manager, by 2019, AllianzGI was well aware that Lehigh viewed the Funds to have low active risk (tracking error) with

17

monthly returns constrained to a narrow range around U.S. and foreign equity market benchmarks.

68.     Between 2013 and 2020, AllianzGI induced Lehigh to invest, and to retain its investments, in the Funds by repeatedly representing—falsely, as it turned out—that the Funds' strategy and protections met Lehigh's objectives.

A.     **AllianzGI's Representations Concerning its Investment Strategy**

69.     AllianzGI consistently represented to Lehigh that the Funds would employ a robust and stress-tested uncorrelated options strategy that was designed to provide modest returns over the Funds' respective reference market indexes, while also protecting the Funds from significant losses in the event of a market downturn.

70.     Indeed, according to various marketing materials provided to Lehigh, the Funds' "Structured Alpha strategy aims to provide consistent, uncorrelated returns regardless of the direction of equities and volatility.  The strategy pursues risk-controlled returns by buying and selling put and call options on US equity and volatility indexes."

71.     Further, the strategy was designed "to weather different market environments due to the continual optimisation [*sic*] of three types of building blocks" that would give the Funds the "[a]bility to *perform whether equity markets are up or down, smooth or volatile*." (Emphasis added.)

1.     **AllianzGI Represented in Its PPMs and Marketing Documents That the Funds Were Designed to Protect Against a Market Crash**

72.     In its PPMs for the Funds, dated January 1, 2013 and December 31, 2017 (for the U.S. Fund) and December 31, 2017 (for the Global Fund), AllianzGI explained that its strategy would involve investing in both a "beta component" and an "alpha component."  The beta component would consist "of a futures trading program, cash

18

investments, exchange traded funds, [and] equity swaps or securities" to achieve exposure to the Funds' respective reference market indexes.

73. Generally, in finance, "beta" refers to the measure of risk arising from exposure to general market movements. With respect to the U.S. Fund and the Global Fund, the beta component consisted of their exposure to their respective market references indexes: the S&P 500 Index and the MSCI ACWI Index. (Lehigh thus does not seek to recover losses due to the beta component, which essentially mirrors the movement of the relevant index.)

74. "Alpha" refers to an investment's active return, or its percentage gain or loss, relative to its reference index.

75. The Funds' alpha components were identical to each other and consisted of investments "in puts and calls on equity indices through the use of a proprietary model to construct options spreads." According to AllianzGI:

> Structured Alpha is a carefully researched, consistently implemented option strategy that aims to provide consistent and **uncorrelated** returns. Using versatile, **plain vanilla option positions**, the strategy has the ability to consistently benefit from the fear- and greed-driven behavior of option-market participants. The goal is to deliver a **steady, resilient return stream with a fundamental emphasis on risk management**. (Emphasis added.)

76. A put is an option contract that grants the buyer of the put the right, but not the obligation, to sell a specified amount of an underlying security at a pre-determined price, or strike price, within a specified time frame.

77. The purchase of a put (also known as a long put), typically operates as a hedge against a market downturn. That is, when a security's market value drops below the strike price, the owner of the put will exercise its right to sell the security at the higher

19

strike price for a profit, thus limiting the trader's losses.  Conversely, the seller of the put will suffer a loss in this scenario, because such seller must buy the security at above-market prices.

78.     Sellers of puts, however, receive a payment, called a "premium" for selling the options contract.  Thus, if the market value of the security remains above the strike price and the buyer of the put does not exercise its option, then the seller of the put will profit by the amount of the premium.  A sale of put options is often referred to as a short put.

79.     A call is an option contract that is the opposite of a put, giving the buyer of the call the right, but not the obligation, to buy a specified amount of an underlying security within a specified time frame at a contractual strike price.  Call option contracts generate positive returns for a buyer when the market value of the underlying security exceeds the contractual strike price during the specified time period.  By the same token, the seller of a call option contract loses money when the value of the underlying security rises above the strike price, because it must sell the underlying security at below-market prices.

80.     As with sellers of put options, sellers of call options profit by the amount of premium they receive from selling the contract, if the market value of the underlying security remains below the strike price and the buyer does not exercise its option.

81.     In sum, if a trader sells short puts and short calls, the trader can earn money from the premiums received for selling the contracts.  However, if the underlying securities move past their strike prices, the contracts obligate the trader to buy securities

at a price higher than the prevailing market price (short puts) and/or sell them at a price lower than the prevailing market price (short calls).

82.     Accordingly, without additional protections, including, for example, long puts, selling short puts and calls can present significant risk of loss.  Indeed, selling options can be among the riskiest trading strategies — particularly in circumstances where the seller does not own the underlying security.  In such circumstances, the seller of an option has near limitless downside risk.

83.     By buying and selling put and call options with various strike prices pursuant to its proprietary trading strategy, AllianzGI sought to boost the Funds' profits while providing significant protection in the event of a market sell-off.

84.     AllianzGI elaborated on its proprietary trading strategy, which it titled "Structured Alpha," in a 2014 marketing document for the U.S. Fund titled "Strategy Overview - Structured Alpha: In Pursuit of Risk Controlled Returns" ("Strategy Overview").

85.     In this document, AllianzGI described the strategy as one that "aims to deliver returns *regardless of market conditions*."  AllianzGI further represented that the strategy had a "three-pronged objective":  (1) "to profit during normal (up/down/flat) market conditions"; (2) *to "[p]rotect against a market crash"*; and (3) to "[n]avigate as wide a range of equity-market outcomes as possible."  (Emphasis added.)

86.     To achieve its three-pronged objective, the Structured Alpha strategy would employ a "combination of both long- and short-volatility positions at all times."

87.     Market volatility concerns the degree of variation of a trading price over time.  A trading position that is "long-volatility" has a higher expected value if market

21

volatility increases; a position that is "short volatility" has a higher expected value when market volatility is low.  Usually, a market shock will cause higher market volatility.

88.     AllianzGI represented that, by taking a combination of long- and short-volatility positions "at all times," the Funds would "capitalize on the return-generating features of selling options (short volatility) while simultaneously benefitting from the risk-control attributes associated with buying options (long volatility), to continually optimize the balance between these two types of exposures."

89.     AllianzGI primarily measured and evaluated volatility with the Chicago Board Options Exchange's CBOE Volatility Index (the "VIX"), a popular measure of the stock market's expectation of volatility based on S&P 500 index options.  The VIX gauges investors' expectation of a large market move by measuring implied volatility of at-the-money S&P 500 options.  Investment managers like AllianzGI typically use volatility, particularly the VIX index, as a proxy for risk.

90.     As AllianzGI later explained in 2019, "the key driver of the [Funds'] option portfolio's profitability was not the behavior of the equity market, but rather the volatility environment relative to the equity-index path."

91.     AllianzGI's Strategy Overview further detailed that its Structured Alpha portfolio construction would consist of "three types of positions."

> a.     First, AllianzGI would take "range-bound" or "short-volatility positions," which are "designed to collect option premium and to generate excess returns in normal market conditions." AllianzGI represented that, "based on detailed, proprietary statistical analysis, put and call options are sold to create 'profit zones' that have a high

probability of success upon expiration of the options." These options positions would make money if the underlying asset stayed in a particular range, but would lose money if the price of the underlying asset landed outside the range. If the market remained stable, AllianzGI could sell protection (and, thus receive premium payments) against upside or downside "tail risk"—the possibility that the market could increase or decline by an extreme amount—without having to pay anything out. As long as markets remained stable and the market index finishes inside the profit zone at expiration of the option contract, the strategy would profit.

        b.      Second, AllianzGI would take "directional" or "long-short" volatility positions designed to generate excess returns when equity indexes are rising or declining more than usual over a multi-week period." These positions "are built by buying and selling options to both the upside and downside to create profit zones several percentage points away from current equity index levels."

        c.      Third, AllianzGI would hedge its investments by taking "long-volatility positions, designed to protect the portfolio in the event of a market crash." This entails the purchase of "put options . . . at various levels to the downside." AllianzGI represented that its "long puts [would be] in place at all times, exclusively for risk management purposes."

92.     Subsequent AllianzGI communications illustrated the options positions as follows:



93.     While long puts typically have a negative expected return when markets are stable, they protect an investment when a "tail-event" or market crash occurs. AllianzGI represented in the Strategy Overview that, for this reason, the long put positions **_are a cornerstone of Structured Alpha's investment process_.**  (Emphasis added.)

94.     AllianzGI repeatedly stressed that the purpose of these three types of options positions was to generate income for the portfolio and to provide a hedge against a market crash.

### 2.     AllianzGI's Representations About the Funds' Strategy in Presentations to Lehigh

95.     AllianzGI reiterated its representations about its investment strategy in a series of nearly-identical meeting presentations, or pitchbooks, that it provided to Lehigh

in September 2017, May 2018, August 2018, and December 2018 in advance of portfolio review meetings.

96.     The presentations uniformly restate the three-pronged objective of the Structured Alpha strategy.

97.     The pitchbooks also explain that AllianzGI's investment strategy:

- *did "not presume that the market will behave normally or that history will repeat itself";*

- *"never ma[d]e a forecast on the direction of equities or volatility"; and*

- *would "always be a net buyer of put options, providing protection against a tail event or market crash."*  (Emphasis added.)



98.     Furthermore, the pitchbooks consistently represent that AllianzGI would purchase long put options with strike prices set between 10% and 25% to the downside of the reference market index.  According to the pitchbooks, the "primary objective of

[these] positions is to protect the strategy from a short-term equity-market crash," which
is "defined as a decline of 10% to 15% in less [*sic*] than 5 days."

### 3.   AllianzGI's Representations About the Funds' Strategy in Quarterly Updates

99.     In addition to its marketing and meeting materials, AllianzGI also
provided quarterly strategy updates ("Quarterly Updates") to Lehigh throughout Lehigh's
investments in the Funds.  These updates describe the performance of the Funds for the
preceding quarter and provide an outlook for future performance and strategy.

100.    The Quarterly Updates echoed AllianzGI's representations in the
pitchbooks and the Strategy Overview that it would construct an options portfolio
designed to benefit from a range of market scenarios and that the Funds would always be
simultaneously long and short volatility, protecting them from directional movements in
the market.

101.    For example, the Quarterly Update for the Second Quarter of 2014 for the
U.S. Fund states:

- "As a combination long-short volatility strategy, Structured Alpha
  is designed to benefit from higher levels of market volatility yet,
  importantly, still be able to outperform its target when volatility is
  low."

- "By design, Structured Alpha US Equity 500 is positioned to
  outperform when conditions are normal, to navigate when they are
  abnormal, and *to deliver flat or positive relative returns in the
  event of a crash.  Not having to correctly predict the direction of
  equities, or of volatility, is especially advantageous* given the
  growing ambiguity among market participants." (Emphasis added.)

102.    The Quarterly Update for the First Quarter of 2015 states:

- "As a reminder, higher levels of volatility afford our spreads the
  opportunity not only for greater profit potential, but also for wider
  statistical safety."

26

- "Looking ahead, so many crosscurrents seem to be affecting equities simultaneously that indexes are moving quite a bit, yet without a discernable trend. This type of market behavior is generally favorable for [the U.S. Fund]…."

- "*Rather than <u>ever</u> try to outperform by forecasting the direction of equity indexes*, we remain focused on building option positions that can collectively navigate as wide a variety of market scenarios as possible."  (Emphasis added.)

103.  Both Funds' Quarterly Updates for the First Quarter of 2019 state: "[I]t is important to bear in mind that *we always construct the option portfolio for multiple scenarios*."  (Emphasis added.)

104.  Similarly, the Quarterly Updates for the Third Quarter of 2019 state: "To be clear, Structured Alpha . . . is designed to pursue its outperformance objectives *in any volatility environment.  But if a sustained higher VIX were to continue, so much the better.*"  (Emphasis added.)

105.  The Funds' Quarterly Updates for the Fourth Quarter of 2019 remarked that VIX "sensitivity" and "heightened responsiveness is beneficial to our ongoing portfolio construction."  AllianzGI also continued to reinforce that "Macro environment aside, *today we are as prepared as ever in the event of a severe market dislocation*."  (Emphasis added.)

### B.   AllianzGI's Representations Concerning the Funds' Risk Profile

106.  AllianzGI frequently reconfirmed to Lehigh that, by employing the Structured Alpha investment strategy, the resulting risk profile of the Funds conformed to Lehigh's investment objectives for this portion of its portfolio.

107.  In particular, the 2014 Strategy Overview represents that the Funds could "navigat[e] a wide range of equity-market outcomes" and would be protected against a

27

market crash. Indeed, AllianzGI represented that "higher volatility level[s] would enable increased outperformance potential and better risk control," and "a protracted bear market is a highly favorable environment for Structured Alpha."

108.    Furthermore, all of the meeting presentations prepared by AllianzGI state that the Funds were expected to track their respective market reference indexes, within a 3% to 5% error range. This meant that the Funds should generally track the reference market indexes within a range between 3% and 5% per year.

109.    Additionally, the presentations state that, because AllianzGI would at all times hedge its positions, the Funds would not be highly correlated with fluctuations in the market.

110.    As further support for these representations, AllianzGI provided Lehigh with monthly risk reports, which purportedly modeled how the Funds would fare in response to stresses in the equity index and changes in market volatility.

111.    The risk reports were not directly prepared by AllianzGI, but rather, by IDS GmbH ("IDS"), an affiliate within the Allianz Group and a wholly-owned subsidiary of Allianz SE. According to its website, IDS provides "data management, risk controlling, performance analysis, and reporting for investments" for asset managers within the Allianz Group.

112.    The risk reports from 2013 to January 2020 uniformly represent that the Funds would, at worst, experience only relatively limited losses in the event of a market downturn.

113.    None of the monthly risk reports indicated that the Funds' options portfolio was structured as a bet on market movement or VIX directionality.

114.    The December 31, 2019 risk report, for example, illustrates that, even if the market experienced a 300% increase in volatility and the S&P 500 experienced a steep decline of 20%, the U.S. Fund would yield a positive return of 1.52%, pursuant to the Structured Alpha strategy.  Alternatively, a 200% increase in volatility with the same 20% decline in the market would yield a modest loss of only 4.9%.  The report further represents that there was only a 1% chance of the U.S. Fund losing more than 0.34%, which indicated that the U.S. Fund would not be particularly sensitive to movements in the S&P 500 or changes in implied volatility.

115.    Prior risk reports from 2014, 2015, 2016, 2017, and 2018 likewise illustrate that, under AllianzGI's Structured Alpha investment strategy, the Funds would experience relatively small directional exposure to the underlying reference market index. Indeed, the reports represent that the Funds could be profitable even in circumstances where the implied volatility increased by more than 200% and the reference index declined by 10% or more.

116.    In February 2018, AllianzGI also sent Lehigh a document titled "Structured Alpha Sensitivity to Down Markets."  This document, similar to the risk reports, modeled the expected performance of the Structured Alpha strategy under varying degrees of decline in the S&P 500 and various levels of volatility in the market, as measured by the VIX.

117.    According to this report, the potential losses from the options portfolio were well contained with maximum losses of 8% resulting from a scenario where the S&P 500 declined 10% in less than a week with a low VIX starting point.  In a scenario where the S&P 500 declined 20% in less than a week, Allianz projected the options

portfolio to have positive earnings across all VIX levels. Scenarios over a month in duration were largely consistent with losses contained to less than 7% across all VIX starting points.

118.    Thus, across pitchbooks, risk reports, and other documents, AllianzGI consistently represented that the Funds would yield positive returns or modest losses in most scenarios, and, critically, that the options portfolio constrained downside risk and would weather a financial crash with relatively limited losses.

      C.    **AllianzGI's Representations Concerning its Risk Management**

119.    AllianzGI also consistently represented that it had in place a robust risk management system that would, among other things: (1) monitor AllianzGI's investment positions for risk and (2) enable AllianzGI to respond quickly and successfully to market downturns to avoid serious losses.

120.    For example, AllianzGI represented in pitchbooks from 2014 that it had in place "multiple layers of risk control," which involved "real-time risk monitoring, as well as analysis of statistically significant equity-market scenarios."

121.    AllianzGI further repeatedly represented in pitchbooks from 2017 and 2018 that investment risk "is continuously managed and monitored at both the portfolio level by the investment team and the firm level."

122.    Specifically, according to the pitchbooks, Allianz SE's subsidiary, IDS, was responsible for the following:

      a.    "Evaluat[ing] and monitor[ing] portfolio and counterparty risk, business risk, operational risk, and reputational risk";

      b.    "Independent portfolio risk oversight";

      c.    "Monitor[ing] daily trade activity and weekly risk profiles";

> d.     "Evaluat[ing]: VaR and expected shortfall; 31 stress tests; contribution to risk by index product; GARCH estimates of risk; Delta, Gamma, and Vega analysis; analysis of performance statistics."



## Two pillars of risk management

- Risk is continuously managed and monitored at both the portfolio level by the investment team and the firm level

**Firm-level**

- Evaluates and monitors **portfolio and counterparty risk, business risk, operational risk,** and **reputational risk**
- **Independent Enterprise Risk Management function** responsible for independent portfolio risk oversight monitors daily trade activity and weekly risk profiles
- **Supported by IDS GmbH - Analysis and Reporting Services (IDS),** an independent service provider
- **Evaluates:**
  - VaR and expected shortfall
  - 31 stress tests, contribution to risk by index product GARCH estimates of risk
  - Delta, Gamma, and Vega analysis
  - Analysis of performance statistics

**Portfolio-level**

- **Real-time risk management and monitoring** based on statistical equity index behavior
- **Proprietary scenario and stress testing models**
- **Monitoring of bid-ask spreads** for options to ensure that our restructuring discipline is executable

123.    The pitchbooks further confirm that references to the "firm" mean Allianz Global Investments, as the group of entities comprising Allianz Global Investors that "coordinate their research, investment, and trading activities." Additionally, such coordination is subject "***to common supervision*** by [Allianz Global Investor's] Global Chief Investment Officer." (Emphasis added.)

124.    At the portfolio level, AllianzGI represented that it would engage in "real-time risk management and monitoring based on statistical equity index behavior." Additionally, Allianz would prepare "proprietary scenario and stress testing models" to test how the portfolio would perform under different market conditions.

125.    The pitchbooks also explain that, as part of its risk management process, AllianzGI restructures its investment positions from time to time in response to changes in the market.  AllianzGI represented that one of its restructuring methods it may employ during a market downturn is called "stop-loss."  With this method, AllianzGI closes out its options positions to prevent serious losses to the portfolio.

126.    Relying on AllianzGI's representations, Lehigh believed that AllianzGI had conducted adequate stress tests to ensure that its investment positions would protect the Funds against possible market scenarios and would monitor and respond to changes in the market with appropriate restructuring strategies.

**D.    AllianzGI's Meetings with Lehigh Confirmed and Reinforced Its Written Representations about Strategy and Risk**

127.    Prior to March 2020, AllianzGI's oral representations to Lehigh conformed to the written statements detailed above.

128.    For example, on April 7, 2016, Lehigh's then-Director of Alternative Investments met with Stephen Bond-Nelson, a Portfolio Manager, and Michele Cameron, a Senior Relationship Manager, from AllianzGI.  In that meeting, they stated that the U.S. Fund took **"*no directional bets*."**  (Emphasis added.)

129.    A few months later, on July 27, 2016, Kristin Agatone, who had recently been appointed as Lehigh's new Chief Investment Officer, met with AllianzGI as part of a comprehensive review of all of Lehigh's investment managers.

130.    During Ms. Agatone's meeting with AllianzGI in July 2016, she made clear that Lehigh viewed the Structured Alpha strategy as a low active risk strategy within the university's portfolio.  She stated her expectation that the U.S. Fund would

track the S&P 500 with the options portfolio providing uncorrelated incremental returns in a narrow upside and downside range.

131.    In response, AllianzGI briefed Ms. Agatone on the Funds' objectives and strategy, reiterating the content set forth in prior written communications to Lehigh. In particular, AllianzGI stated to Ms. Agatone that the Funds were "***uncorrelated***" and "***non-directional.***"

132.    In addition, AllianzGI affirmed that their risk management mechanisms included a "stop-loss" component.

133.    Based on these and other representations, Lehigh deemed the U.S. Fund's risk profile acceptable to the university and continued to hold its investment in the Fund.

134.    AllianzGI made similar representations to Lehigh in subsequent meetings. For example, in a December 2018 meeting with Michele Cameron and Jeff Sheran, an AllianzGI Product Specialist, the AllianzGI representatives described to Michael Gould, a Senior Investment Analyst in Lehigh's Investment Office, how the Funds' options positions were constructed with respect to volatility.

135.    Specifically, AllianzGI represented that the Funds were long and short volatility at the same time, but, "in a crash scenario," the Funds were long volatility (*i.e.*, designed to profit when the markets were highly volatile).

136.    AllianzGI also reinforced, yet again, that the Funds' strategy is not predicated on market directionality for equity and volatility forecasts. "Their job is to play the hand that is dealt."

137.    In a November 2019 meeting between Jeff Sheran and Michele Cameron at AllianzGI and Michael Gould from Lehigh's Investment Office, AllianzGI reassured

Lehigh that the Funds' long put hedging positions are "always there", which will "save for the crash."

138.    At this meeting, Lehigh and AllianzGI also addressed whether the Funds' exposure to the equity markets, which were achieved via swap contracts, could result in margin calls when the equity markets declined significantly.  AllianzGI stated that no downside move would lead to a margin call.

139.    In reliance on these representations, Lehigh retained its investments and made further investments in the Funds.

## VII.    AllianzGI, Unbeknownst to Lehigh, Altered the Funds' Strategy and Risk Profile

### A.    AllianzGI Unilaterally Changed Its Investment Strategy

140.    Unbeknownst to Lehigh, by April 2019, AllianzGI deliberately changed its investment strategy to increase the options portfolio's directionality and sensitivity to market swings, and hence, downside risk.

141.    In particular, AllianzGI became a net seller of short options – *i.e.*, AllianzGI gambled that the financial markets would remain relatively static and not decline, thus generating higher profits (and management fees) in low volatility environments.  In essence, AllianzGI sold insurance against a market decline and increased volatility.

142.    In fact, Lehigh subsequently learned that, by April 2019, AllianzGI had nearly *quadrupled* the Funds' negative gamma, a key options portfolio metric universally used by options traders to calculate the directionality of the manager's positions and the sensitivity of the options contracts to changes in the underlying equity prices.

143.    In other words, AllianzGI had sold options contracts that qualitatively and quantitively placed a significantly more aggressive bet that equity markets would remain neutral or trend upward and that volatility would remain low.

144.    In particular, the short puts sold by AllianzGI, which were not hedged by adequate long puts, saddled the Funds with a catastrophic obligation to buy securities at prices above prevailing market prices if the market declined.  This obligation ensured that, if the market crashed, the Funds' losses would significantly exceed any losses incurred from mere exposure to the market (*i.e.*, losses solely due to investments in the S&P 500 or MSCI ACWI).

145.    AllianzGI's gamble on continued market stability and low volatility directly contradicted its ongoing representations to Lehigh (that began in 2013 and continued until 2020) that AllianzGI would not bet on the directionality or volatility of the market and it would "at all times" employ a combination of long- and short-volatility positions to guard against unpredictable fluctuations in the market.

146.    AllianzGI apparently reconfigured its investment strategy to enhance profits and generate higher incentive fees.  AllianzGI's prior direction-neutral strategy, while less risky, generated comparatively modest returns during normal market conditions with low volatility.  AllianzGI's new strategy, in contrast, inflated the Funds' returns, correspondingly inflating AllianzGI's incentive fees.

   **B.    AllianzGI Unilaterally Elevated the Funds' Downside Risk**

147.    AllianzGI's strategy change resulted in a significantly higher — and undisclosed — downside risk.

148.    The Funds' options portfolio was no longer positioned to withstand most declining equity markets nor a rising VIX.  Instead, the Funds would yield positive returns when the underlying market indexes remained neutral or increased in value.

149.    AllianzGI's modifications also rendered the Funds' alpha component heavily correlated to movements in the S&P 500 and MSCI ACWI indexes and therefore much more exposed to market fluctuations than AllianzGI had led Lehigh to believe.  In particular, because AllianzGI had substantially increased the Funds' short options exposure, the Funds would lose increasingly large amounts of money in the event that the stock market rapidly declines.

150.    Compounding this effect, the Funds' greatly increased negative gamma ensured that the Funds' options losses would *accelerate* more rapidly as the market moved downward.  Unbeknownst to Lehigh, the Funds had become a disaster waiting to happen.

## VIII.    Lehigh's 2019 Investments in the Global Fund

151.    Based on AllianzGI's ongoing representations about the Structured Alpha strategy and the U.S. Fund's consistent performance, in 2019, Lehigh opted to further diversify its AllianzGI portfolio's exposure to foreign equity markets.

152.    Between March 2019 and November 2019, Lehigh withdrew $35,000,000 from the U.S. Fund.  It then made new investments in that amount in the Global Fund, which employs precisely the same Structured Alpha options strategy as the U.S. Fund and applies it to the foreign equity markets.

153.    Lehigh decided to invest in the Global Fund in reliance on all of AllianzGI's foregoing representations because AllianzGI's marketing materials and oral

representations by, among others, Jeff Sheran and Michele Cameron, provided that the U.S. Fund's options strategy and downside risk protections applied equally to the Global Fund.

154.    Likewise, AllianzGI's failure to disclose the significant changes it had made in its Structured Alpha strategy and risk profile was equally material as it hid the Global Fund's increased risk profile from Lehigh.

## IX.    AllianzGI Knowingly or Recklessly Misrepresented and Omitted Material Information Regarding the Funds' Strategy and Risk after March 2019

155.    AllianzGI indicated in late 2018 that it had begun to modify the options strategy in light of the persistently low VIX.  Specifically, in its December 2018 pitchbook, AllianzGI disclosed that it was reallocating a large number of its long puts into its sealed range-bound spread positions; in other words, it was buying a much larger percentage of the Funds' long puts closer to the money.

156.    Doing so should not have increased risks to the Funds' portfolios.  Indeed, AllianzGI represented that the "[m]ax loss [of the new structure is] comparable to original configuration restructuring costs."  It also represented that this modification would result in "[s]ubstantially less realized loss at times of market stress."



157.    AllianzGI never disclosed to Lehigh that, by April 2019, it had actually changed the Fund's strategy to gamble on the market's direction — or that it had shorted volatility.  Likewise, AllianzGI never indicated that the Funds' downside risk could be impacted.

158.    In fact, even after it had taken its directional bet, AllianzGI continued to falsely represent to Lehigh that the Funds' options strategy was market-agnostic and designed to profit in the face of market declines.

159.    AllianzGI's false statements and omissions altered the core of the Funds' strategy and objectives and, therefore, undercut the rationale for Lehigh's decision to make its investments in the Global Fund and retain its investment in both Funds.

A.     **AllianzGI's False Statements Following Its Undisclosed Directional Bet**

160.    In the Quarterly Update for the First Quarter 2019, dated March 2019 and distributed to Lehigh on April 30, 2019, AllianzGI falsely stated that the Funds' options strategy was market agnostic and that it "always construct[s] the option portfolio for multiple scenarios" so that if the market "stayed down or continued lower," AllianzGI expected beneficial behavior for the portfolio.  In fact, AllianzGI further represented that "[w]hen the VIX is higher at the time of position construction we are able to build range-bound spreads that have increased statistical safety and resilience to begin with," thus suggesting that a higher VIX would be beneficial to Funds.

161.    These representations were false.  In fact, by April 2019, the Funds had significantly increased their negative gamma and, therefore, their decline in value would accelerate if the market declined.  Moreover, the increased negative gamma meant that the Funds were functionally shorting the VIX, and since volatility almost always spikes in connection with a market decline, a higher VIX would be — and ultimately was — disastrous.

162.    In its Quarterly Update for the Second Quarter 2019, sent to Lehigh on July 30, 2019, AllianzGI continued to falsely assert that its options strategy was well-positioned to handle a significant market decline.  Specifically, AllianzGI stated that after its "hedging reallocation," the Funds were "better situated to handle equity-index fluctuations," and "[f]rom a risk perspective[,] our option portfolio is built to handle quite a lot."

163.    In the Quarterly Update for the Third Quarter 2019, which was transmitted to Lehigh on October 30, 2019 AllianzGI falsely stated that the Funds were "designed to

39

pursue [their] outperformance objectives *in any volatility environment*."  (Emphasis added.)  The report also stated that "sustained higher VIX" was better for the Funds.

164.    Again, these statements were false for at least two reasons.

165.    First, the Funds' substantial negative gamma meant that the Funds would lose significant value in the event of a market decline (with its accompanying high-volatility) and, thus, they could not outperform "in any volatility environment."

166.    Second, these statements, when combined with AllianzGI's prior representations about its robust risk management mechanisms, falsely indicated that the Funds' options strategy had been stress-tested for a high-volatility market occurring over a multi-day market decline.  As described below, AllianzGI admitted in a March 5, 2020 call that it had never done so.

**B.    AllianzGI Failed to Disclose That the Funds Were Not Directionally Neutral**

167.    AllianzGI also knowingly or recklessly omitted material information in its reports to Lehigh, which helped conceal from Lehigh the fact that AllianzGI's strategy had become significantly riskier by April 2019.

168.    First, none of the Quarterly Updates from 2019 indicated in any way that the Funds had functionally shorted volatility.  Instead, as detailed above, they uniformly, and falsely, emphasized that the Funds were constructed for multiple market scenarios, including market decline/high-volatility scenarios.

169.    Second, throughout 2019, Lehigh continued to receive monthly risk reports prepared by IDS.  Critically, though the risk reports contained various metrics to evaluate the Funds' options portfolio, they omitted any gamma calculation.  This omission shielded the Funds' short market position from Lehigh.

170.    All the other metrics included in the risk reports issued to Lehigh throughout 2019 almost uniformly indicated that (i) increases in implied volatility of greater that 200% and 20% declines in the market would result in gains or losses consistent with the Funds' objectives; (ii) value at risk remained under 2.5%; and (iii) the Funds possessed *de minimis* directional exposure to movements of the underlying indexes and that the Funds' options portfolio was not particularly sensitive to a change in implied volatility.  Accordingly, all the disclosed metrics falsely indicated a consistent strategy and, therefore, a stable gamma calculation.

171.    Third, AllianzGI failed to disclose that the "stop-loss mechanism" it represented could be used as an emergency precaution, could either be disregarded for its own self-interested purpose or had been rendered ineffective by its new undisclosed options strategy.

### C.    AllianzGI Knew or Was Reckless in Not Knowing That Its Representations Were False or Materially Misleading

172.    AllianzGI knew that its representations in the 2019 Quarterly Updates that the Funds were well-hedged for a potential market decline were materially false, because AllianzGI had intentionally restructured its investment strategy in or around April 2019 so that the Funds would generate higher profits in lower volatility environments and incur losses if the market declined and volatility increased.

173.    Gamma is a basic calculation for options trading, universally used by options traders to help assess risk in a portfolio.  Indeed, in the pitchbooks and in-person meetings, AllianzGI repeatedly represented that IDS monitored this specific metric.  IDS and AllianzGI therefore had undertaken a duty to monitor this data, and either were actually aware of it or were reckless in disregarding their duty to monitor it.

41

174.     Further, because its new investment positions nearly *quadrupled the negative gamma* for the Funds' options portfolios, AllianzGI knew or was reckless in not knowing that the portfolios would suffer serious losses in the event of a market downturn with rising volatility.

175.     For the same reason, AllianzGI knew or was reckless in not knowing that its changed investment strategy caused the Funds to have significantly higher downside risk that was much more correlated with market fluctuations than AllianzGI had previously represented.

176.     As described below, AllianzGI also knew that neither it nor its affiliates had tested the new undisclosed options strategy for a market decline with high volatility. AllianzGI therefore knew, or was reckless in not knowing, the truth of their representations about the Funds' behavior in a declining, highly volatile market.

177.     Similarly, given its inadequate vetting of its options positions, AllianzGI knew or was reckless in not knowing that its advertised risk management and stop-loss procedures might be ineffective or disregarded in the face of market dislocation.

178.     AllianzGI's decision to keep its radical strategic change from Lehigh was not merely motivated by its desire to retain Lehigh and boost its management fees. Rather, AllianzGI's new options strategy directly contradicted the *raison d'etre* of its Structured Alpha strategy —uncorrelated investment returns with robust protections from a market crash — and, therefore, disclosure to anyone would have ensured swift redemptions from investors and demise of the Funds.

179.     Because of all of its prior representations, AllianzGI had a duty to disclose this material change in the Funds' gamma, and therefore its risk profile, to Lehigh.

**X.**      **Lehigh's Reliance on AllianzGI's Representations Was Reasonable**

180.    Because AllianzGI knowingly or recklessly failed to disclose the material facts alleged above, Lehigh had no means of discovering that the Funds' options portfolio had become markedly short volatility and were not market agnostic, as AllianzGI had continued to represent throughout 2019.  Lehigh also could not have known that the Funds' downside risk and correlation to market fluctuations had increased beyond AllianzGI's prior representations because AllianzGI failed to correct such representations.

181.    AllianzGI intended for Lehigh to rely on its materially false or misleading communications in making further investment decisions.  In fact, Lehigh did reasonably rely on such communications to its detriment.  Had Lehigh known that the Funds were no longer directionally neutral and were actually short volatility, Lehigh would have redeemed its existing investments in the U.S. Fund and the Global Fund as of April 2019, and it would not have invested an additional $25,000,000 in the Global Fund thereafter.

182.    Prior to March 2020, Lehigh had no reason to doubt the veracity of AllianzGI's representations about its investment strategy and the associated risks for at least two key reasons: (i) AllianzGI's monthly and quarterly risk reports provided that downside risk was limited, consistent with AllianzGI's representations and Lehigh's expectations; and (b) when there had previously been significant market sell-offs, the Funds had historically performed in line with AllianzGI's representations.

183.    For example, in the second quarter of 2016, when the markets experienced a massive sell-off and rapid increase in volatility due to Britain's exit from the European Union, the U.S. Fund experienced a positive 3.77% return, net of fees.

184.    Similarly, according to AllianzGI, between February 2 and February 9, 2018, the S&P 500 dropped 10.2% and, on February 5, 2018, the VIX increased by 115% -- its largest single day percentage move in more than 30 years.  Nevertheless, the U.S. Fund experienced a negative return of only 3.36% for the quarter (compared to a quarterly return of -0.76% for the S&P 500), net of fees, which meant that it underperformed the S&P 500 by only 2%.  This was within expectations based on the 3% to 5% tracking error that AllianzGI had disclosed.

185.    Furthermore, according to the December 2018 pitchbook, the U.S. Fund had an Alpha—or excess return relative to the S&P 500—of 3.89% over its lifetime, which was consistent with Lehigh's expectations of performance and risk.

## XI.    Allianz SE Controlled IDS and AllianzGI US and Culpably Participated in Their Misconduct

186.    At all relevant times, Allianz SE directly owned 100% of IDS and indirectly owned 100% of AllianzGI US as the parent company of the Allianz Group.

187.    Allianz SE controls both entities and has a duty to monitor their conduct.

188.    As described above, Allianz SE controls and monitors the business objectives, strategic direction, and risk management for its affiliates, including AllianzGI.

189.    AllianzGI's own pitchbooks state that its portfolios' risk is monitored at the "firm level," with the firm defined as Allianz Global Investors.  The pitchbooks also explain that AllianzGI coordinates its "research, investment, and trading activities" with affiliated entities under the Allianz Global Investors brand, and that such activities subject "to common supervision" by the Global Chief Investment Officer of Allianz Global Investment, who was employed by affiliate entities owned and controlled by Allianz SE.

44

190.    Given that Allianz SE exerted control over AllianzGI—and particularly over its investment decisions and risk management—Allianz SE had a duty to monitor AllianzGI's activities and disclosures.

191.    Allianz SE therefore knew or should have known that Allianz GI had, without informing Lehigh, altered its investment strategy so that it was no longer directionally neutral, and the Funds were no longer hedged in the way that AllianzGI had represented.

192.    Allianz SE also knew or should have known that AllianzGI had failed to adequately monitor the risk profile of the Funds and had failed to disclose to investors that, as a result of its unilateral change in strategy, the Funds had a much higher downside risk and were much more correlated to the market than it had previously represented.

193.    Moreover, Allianz SE had a duty to ensure that AllianzGI ran adequate stress tests on the portfolios.  It therefore knew or should have known that AllianzGI failed to test the portfolios for a market decline comparable to that experienced in February and March 2020.

194.    Additionally, as the entity responsible for supervising the coordination of its subsidiaries, Allianz SE had a duty to ensure that IDS provided adequate reports to AllianzGI.  Allianz SE knew or should have known that IDS's risk reports were materially deficient in their failure to identify the Funds' altered risk profile.

195.    By failing to discover and/or to disclose AllianzGI's material misrepresentations and omissions, Allianz SE either knowingly participated in AllianzGI's fraud, or recklessly ignored red flags in the form of dramatically heightened negative gamma, net short-volatility positions, and inadequate stress testing.

45

**XII.   AllianzGI Admits that it Misrepresented the Funds' Strategy**

196.   In February 2020, the COVID-19 pandemic caused the stock market to drop approximately 9%.

197.   Unlike in prior market downturns, however, the Funds experienced a precipitous drop.  At the end of February 2020, AllianzGI informed Lehigh that the U.S. Fund and the Global Fund had each declined nearly 19% that month.  This meant that the Funds had a -10% excess return for the month, which far surpassed the annual tracking error of 3%-5% and, thus, far exceeded the expected losses for the Funds that AllianzGI had previously disclosed.

198.   Specifically, AllianzGI's risk reports consistently indicated that value at risk for the Funds was less than 2.5%, and the document titled "Structured Alpha Sensitivity to Down Markets" indicated that the maximum expected losses for the U.S. Fund was around 8%, which would occur only if the market had *low* volatility and the S&P 500 declined by about 10%.  For a market decline with greater magnitude and higher volatility—as was the case during the 2020 decline—the *risk reports consistently predicted modest gains or limited losses* for the Funds.

199.   When Lehigh promptly sought explanations as to the cause of the February losses in early March 2020, AllianzGI admitted that its prior representations about its investment strategy, the Funds' risk profile, and its risk management system were false.

**A.      AllianzGI Reveals that the Funds Were Structured to**
**         Be Short Volatility**

200.   In a series of telephone calls and written disclosures in early March, responding to intense questioning from Lehigh that was prompted by the unexpected drop

in the Funds' value, AllianzGI revealed for the first time the extent to which its modifications to the Funds' options strategy had increased the Funds' risk.

201.    For example, a document titled "Historical Greeks Exposure," produced to Lehigh in March for the first time, provided the historical gamma calculations for the Funds.  In doing so, AllianzGI disclosed for the first time the significant negative gamma increase in 2019 and that the Funds were much more exposed to directionality than previously represented.

202.    In a March 9, 2020 email, Michele Cameron, AllianzGI's senior relationship manager, confirmed that the Funds' options gamma profile increased as of April 2019 due to a "new directional call program" and an "increase in VIX option positions."

203.    Additionally, on a March 13, 2020 conference call with AllianzGI, Trevor Taylor, the Funds' Co-Lead Portfolio Manager, admitted that the Funds were overall "clearly a short volatility strategy."

204.    During this same period, AllianzGI also revealed that it had purchased an inadequate number of put options, and that the strike prices of the put options it did purchase were far below the price range that it had previously represented to Lehigh.

205.    Specifically, in a document titled "AllianzGI US Equity 500 Holdings and Deltas 1/31/2020," AllianzGI revealed that many of the strike prices for the long puts options it purchased were well below the -10% to -30% range that Allianz had previously represented in its pitchbooks and purchased in insufficient quantities to provide the meaningful downside protections promised to Lehigh.

**B.      AllianzGI Admits That the Funds' Downside Risk Was
Much Higher Than Previously Reported**

206.    In a March 5, 2020 conference call, AllianzGI informed Lehigh, for the
first time, that the Funds had a downside risk which substantially exceeded AllianzGI's
prior representation that the Funds would suffer maximum expected losses of around 8%.

207.    AllianzGI also distributed to Lehigh a Risk Report dated February 28,
2020, which, for the first time, disclosed that the U.S. Fund would lose money in all
scenarios where the S&P 500 declined and the VIX increased significantly.  This risk
applied equally to the Global Fund since it utilized the same options strategy.  Likewise,
in another document titled "Structured Alpha 500 Risk Scenarios," AllianzGI represented
that the Funds would yield positive returns *only* when the underlying market index
remained neutral or increased.

208.    These new disclosures directly contradicted AllianzGI's representations in
prior risk reports, which almost uniformly provided that the Funds would earn positive
returns if the market were to decrease by 10% or 20%.

209.    Finally, the February 2020 risk report also disclosed that the U.S. Fund
was heavily correlated to movements in the S&P 500 and therefore the Funds were much
more exposed to market fluctuations than AllianzGI had led Lehigh to believe.  In
previous communications, AllianzGI had represented that the portfolio would remain
largely uncorrelated with the market index.

**C.      AllianzGI Admits that its Risk Management Was Inadequate**

210.    In March 2020, Lehigh also learned that AllianzGI's risk management
program was inadequate.

211. While AllianzGI had consistently represented that it had in place robust risk management procedures by which it would, among other things, model the Funds' performance in different market scenarios, AllianzGI disclosed during the March 5, 2020 call that it had never conducted any stress tests for a multi-day market decline comparable to what occurred in February and March 2020. AllianzGI therefore did not know and could not prepare for the fact that its investment positions were inadequate to protect the Funds.

212. Additionally, AllianzGI stated that the risk reports it had provided to Lehigh only modeled the Funds' response to overnight shocks to the market and were therefore inapplicable to the market downturn in 2020. Of course, this conflicted with AllianzGI's prior statements in the pitchbooks indicating that it considered a market crash to consist of a decline of 10% to 15% over a period up to 5 days in duration. Moreover, on a March 13, 2020 telephone call, Trevor Taylor, the Funds' Co-Lead Portfolio Manager, admitted to Lehigh's Kristin Agatone and Michael Gould that his portfolio management team had not reviewed or verified the risk reports Allianz distributed to Lehigh.

213. In short, despite years of assurances to the contrary, AllianzGI was completely unprepared for a serious market dislocation. Not only had AllianzGI removed or impaired the downside protections in its investment positions, its stress tests and modeling ignored the possibility that the market could experience a steep multi-day drop — hardly an unforeseeable circumstance.

XIII.   **AllianzGI Blunders in Response to the Coronavirus Market Downturn**

   A.   **AllianzGI Ignored Its Own Chief Economist and, Disastrously, Bets on a Market Rebound**

214.   AllianzGI's undisclosed strategic change resulted in substantial losses in February 2020.  However, AllianzGI then made matters worse by completely mismanaging the Funds in response to the February-March 2020 market event.

215.   By early January, the coronavirus was a known threat to spread from China. On January 21, 2020, equity prices worldwide experienced their first significant decline due to fears that the coronavirus outbreak could harm global economic growth.

216.   On February 3, 2020, Mohamed El-Erian, chief economist for Allianz SE, appeared on CNBC and declared that "[T]he coronavirus is … going to cascade throughout the global economy.  Importantly, it cannot be countered by central bank policy.  So, I think we should pay more attention to this, and we should try and resist our inclination to buy the dip."

217.   Indeed, the VIX Index, which measures the market's expectations of volatility based on the S&P 500 — and which increases in a market downturn—had increased by approximately 200% at the end of February 2020 and leading into March 2020.

218.   As volatility in the market increased, however, throughout February and March 2020, AllianzGI made a series of investments that positioned the Funds' portfolio to generate returns only if the market rebounded and volatility *decreased*.  Thus, AllianzGI entirely ignored the warnings of its own chief economist.

219.   Specifically, as the market began to slide in February 2020, and the Funds began incurring losses, AllianzGI structured the Funds' options portfolio to recoup those

losses by simultaneously selling the Funds' long put protections and buying short puts (*i.e.,* selling put options). In essence, AllianzGI sold the Funds' own insurance against a market decline and used those funds to issue insurance policies against a market decline to other market participants.

220.   Thus, by the end of February 2020, AllianzGI had aggressively gambled that the market would rebound by positioning the portfolio to generate returns if the market stabilized and volatility levels declined. This positioning was a further breach of AllianzGI's ongoing representations that it would buy more long puts than short puts and never bet on the market's directionality.

221.   This gamble was also an unreasonable departure from the standard of care expected of sophisticated investment managers. Indeed, the performance of investment managers using similar strategies as Structured Alpha further exposes the extent of AllianzGI's negligence. For example, two market indexes composed of multiple funds pursuing non-directional options strategies similar to those purportedly employed by the Funds, the HFRI RV Volatility Index and the CBOE Eurekahedge Relative Value Volatility Hedge Fund Index, returned -1.74% and +3.5%, respectively, for March 2020. By contrast, AllianzGI's gross mismanagement resulted in returns of -75% and -72%, respectively, for March 2020. The stark difference is illustrated in the two charts below.





**B.**   **AllianzGI's Management Fee Structure Incentivized Its Gamble**

222.   At the end of February 2020, Lehigh's U.S. Fund and Global Fund accounts had both declined by more than 18% and underperformed the S&P 500 and MSCI ACWI, respectively, by approximately 10%.

223.   AllianzGI needed to reverse this underperformance by the end of March 31, 2020 or else it would be required to recover these substantial losses before it could receive any new fees.

224.     This extreme underperformance not only imperiled AllianzGI's future ability to earn management fees, it also threatened the continued viability of the Funds due to investor redemptions that would inevitably follow drastic underperformance.

225.     Allianz was therefore incentivized to further curtail its expensive long put protection and, instead, bet on a market rebound and attempt to recoup the Funds' losses via sales of short puts.

### C.     AllianzGI Ignored Lehigh's Pleas to Execute the Funds' Stop-Loss Protections

226.     While Lehigh was not yet aware that AllianzGI had doubled-down on its gamble, it was aware of, and alarmed by, the unexpected mounting losses by the end of February 2020.  Accordingly, in early March, Lehigh initiated a series of telephone calls with AllianzGI to troubleshoot the portfolio's decline.

227.     On March 3, 2020, Lehigh and AllianzGI had a conference call, during which AllianzGI claimed that the damage to the Funds was "well-contained."

228.     Additionally, AllianzGI stated in the same call that the strike prices for the long puts purchased for the Funds were spread out at approximately 25% below the original market level, thereby providing additional protection for the funds.  Given these protections, AllianzGI told Lehigh that it should expect no more than a 10% decrease in the Funds' portfolio value.

229.     On March 5, 2020, Lehigh and AllianzGI had another conference call, during which Megan Silva and Michele Cameron from AllianzGI reiterated prior representations that any future shocks would be better managed due to the already high VIX level.  They stated that the vast majority of losses to date were unrealized and most were recovered through the first week in March.  AllianzGI also reiterated that "at the

money they are short volatility, but it starts to become much more long volatility when there is a significant amount of volatility over a short period of time."

230.    However, a week later, on a March 11, 2020 telephone call, AllianzGI admitted that its strategy in response to the February market decline had failed.  It disclosed that it had sold significant amounts of the Funds' long put option contracts — in place to protect the portfolio — in an effort to delay or extend the short put contracts which, due to the market decline, imposed significant risk to the options portfolio.  In other words, in an effort to arrest the Funds' losses, AllianzGI admitted that it sold the Funds' insurance, betting that the market would recover.

231.    Without adequate long puts in place, AllianzGI had left the Funds unprotected against major losses.

232.    On this call, Kristin Agatone asked AllianzGI to promptly de-risk the portfolio to protect the Funds in the event of a further market decline.  Lehigh implored AllianzGI to deploy its advertised stop-loss procedure to close out exposed options positions and stem additional losses.

233.    AllianzGI's portfolio managers arrogantly rejected these requests, assuring Lehigh that the market could not possibly continue to decline, and that volatility could not possibly continue to rise.  This belief directly contradicted AllianzGI's own professed philosophies of "never mak[ing] a forecast on the direction of equities or volatility" or "presum[ing] that the market will behave normally or that history will repeat itself."  The projections of AllianzGI's portfolio managers quickly proved to be wildly off the mark.

234.    On March 13, 2020, AllianzGI finally admitted in a conference call with Lehigh that it had made "major tactical errors" in response to the market decline.  Among

other things, it admitted that it had abandoned its systemic options strategy in favor of an ad hoc approach that gambled that the market would recover quickly.

235.    In addition, AllianzGI admitted on this call that its decision to sell the Funds' long put positions to pay for restructuring the Funds' short puts was a "tactical error" that "turned out to be a bad move."

236.    On this call, Kristin Agatone, Lehigh's Chief Investment Officer, also requested to speak with Deborah Zurkow, Allianz Global Investors' Global Head of Investments, to seek Allianz SE's intervention in its subsidiary's blatant mismanagement. Agatone's efforts were rebuffed.

237.    AllianzGI also admitted once more that it had failed to conduct a stress test for a comparable multi-day market decline scenario.

238.    Thus, in late February and early March of 2020 AllianzGI effectively doubled-down on its risky directional market bets — and lost.  This seat-of-the-pants investment management was exactly the opposite of the disciplined strategy AllianzGI represented to Lehigh it would employ.

**XIV.    AllianzGI's Misconduct Caused Lehigh Substantial Losses**

239.    As a consequence of AllianzGI's covert increase in the Funds' risk-profile and its "major tactical errors" in response to the 2020 market dislocation, the value of Lehigh's investment in the Funds plummeted by more than 75% in February and March 2020.

240.    In particular, when AllianzGI substantially increased the Funds' negative gamma — contradicting its long-standing representations to Lehigh — AllianzGI gambled incorrectly that the stock market would not decline significantly.  Moreover, in

doing so, AllianzGI ensured that that Funds would experience exponentially greater losses in a declining market than mere exposure to the S&P 500 or the MSCI ACWI.

241.    In the face of the COVID-19-induced market losses, the Funds' loss in value would have mirrored the market's losses absent any options investments. However, AllianzGI's undisclosed gamble directly resulted in catastrophic losses to Lehigh's capital accounts — losses significantly greater than any market losses that would have resulted had AllianzGI not engaged in its options strategy.

242.    In the first quarter of 2020, Lehigh's capital account for the U.S. Fund declined from $41,384,833.17 to $10,129,180.17, for a total loss of $31,256,653. Likewise, Lehigh's Global Fund capital account declined from $40,110,838.89 to $8,899,040.95, for a total loss of $31,211,797.94.

243.    Overall, the U.S. Fund and the Global Fund experienced net returns of -75.52% and -77.31%, respectively during the first quarter of 2020.  In contrast, the S&P 500 declined by only 20% and the MSCI ACWI declined by only 13.9% in the same period.  That the Funds significantly underperformed their respective reference market indexes makes clear that their collapse was predominantly caused by AllianzGI's own misrepresentations and negligent mismanagement of its options strategy, the Funds' alpha component.

244.    Likewise, as described above, the performance of the HFRI RV Volatility Index and the CBOE Eurekahedge Relative Value Volatility Hedge Fund Index demonstrates that the Funds dramatically underperformed other investment funds with similar objectives and strategies.  This further demonstrates that the overwhelming majority of Lehigh's losses directly result from AllianzGI's

misrepresentations and mismanagement, and not from the market downturn in February and March 2020.

245.     Moreover, AllianzGI's misconduct violated its core purpose of protecting the Funds from a market crash.  Here, the market downturn in February and March 2020 was not unforeseeable.  On March 16, 2020, the date of the biggest one-day drop of the coronavirus-related downturn, the Dow Jones Industrial Average (the "Dow") dropped just under 13%.  In contrast, the "Black Monday" crash of October 19, 1987 saw the Dow decline over 22% in one day.  Overall, between the middle of February and the end of March, the Dow lost about 35% of its value.  In contrast, the Great Depression saw an 89% decline over a period of about 34 months and the Great Recession beginning in 2007 saw the markets fall by 49% over a period of 16 months.

246.     The VIX spike in February and March 2020 was also not unforeseeable. Periods of sudden spikes in volatility are common and occur at least once a decade.  In fact, in its Fourth Quarter 2019 Strategy Update, in the course of explaining the "resilien[cy]" of the Funds' options portfolio, AllianzGI specifically referenced a February 2018 20-point VIX surge.

247.     By mid-March 2020, Lehigh realized that AllianzGI had structured the Funds to be short volatility, exposed to increased negative gamma, and were being negligently managed.  Accordingly, the Funds were not suitable investments for the portfolio, causing Lehigh to redeem promptly what was left of its investments.  AllianzGI returned to Lehigh a total of $11,299,156.90 from the U.S. Fund and $9,663,951.06 from the Global Fund.

## COUNT I
### (Violations of Section 10(b) of the Exchange Act
### and Rule 10b-5 Promulgated Thereunder Against AllianzGI and Allianz SE)

248.    Lehigh repeats and realleges paragraphs 1 through 247 as if fully set forth herein.

249.    AllianzGI and Allianz SE, by use of the instrumentalities of interstate commerce, intentionally and/or recklessly: employed a device, scheme, or artifice to defraud Lehigh into investing in the Global Fund; made untrue statements of material fact and omitted to state material facts necessary in order to make the statements made not misleading and/or engaged in acts, practices, or courses of business which operated as a fraud and deceit upon Lehigh in connection with Lehigh's purchase of shares in the Global Fund, which constitute securities pursuant to 15 U.S.C. § 77b(a)(1), in violation of Section 10(b)5 of the Exchange Act and Rule 10b-5 promulgated thereunder.

250.    AllianzGI engaged in fraudulent and deceitful acts or practices by knowingly and intentionally making materially false representations, including, but not limited to, its representations in a series of 2019 Quarterly Reports that the Funds were market agnostic and designed to profit "in any volatility environment."  In fact, AllianzGI knew these representations were false, because by at least April 2019, it had intentionally restructured its investment strategy to bet on market stability and, thus, short volatility, as reflected by the fact that the gamma for the portfolios had nearly quadrupled.  Such strategic positioning ensured that the Funds would lose value in a declining stock market.

251.    AllianzGI had the motive to unilaterally restructure its investment strategy, because the new investment strategy generated higher incentive fees for AllianzGI.  Likewise, AllianzGI had the motive to keep its new strategy secret to avoid

investor redemptions likely to result from disclosure of the new strategy, which directly contradicted its long-standing representations to Lehigh and other Structured Alpha investors.

252.    AllianzGI also intentionally or recklessly failed to disclose numerous material facts, the omission of which rendered AllianzGI's prior representations false and misleading.  This includes, but is not is not limited to:

      a.    <u>Directional Bet</u>.  AllianzGI knowingly failed to disclose that it had restructured the Funds to bet on market directionality by April 2019.  AllianzGI also had a duty to monitor the Funds' gamma risk as investment manager; it therefore knowingly or recklessly failed to disclose to Lehigh that the negative gamma values for the Funds had increased substantially as a result of its change in strategy.  In failing to make these material disclosures, AllianzGI intentionally or recklessly concealed from Lehigh that the Funds were no longer market agnostic, in direct contravention of AllianzGI's express and repeated representations.

      b.    <u>Put Options</u>.  AllianzGI knowingly failed to disclose that it had purchased an inadequate number of put options and that the strike prices of a significant number of put options it did purchase were far below the price range it had previously represented to Lehigh in numerous pitchbooks.  This resulted in the Funds having far less downside protection than AllianzGI had consistently represented.

    c.   <u>Risk Exposure.</u>  AllianzGI was responsible for monitoring the Funds' risk exposure as their investment manager, and AllianzGI therefore knowingly or recklessly failed to disclose to Lehigh that, as a result of its covert change in strategy (i) the Funds' downside risk vastly exceeded the risks set forth in its pitchbooks and risk reports and (ii) the Funds were highly correlated to movements in their respective market indexes, which rendered them much more exposed to market fluctuations than AllianzGI had led Lehigh to believe.

    d.   <u>Risk Management.</u> AllianzGI knowingly failed to disclose that it never conducted stress tests for a multi-day market decline, which contradicts its repeated representations that it had robust risk management procedures (i) to provide for the "analysis of statistically significant equity-market scenarios" and (ii) to provide "monitoring based on statistical equity index behavior."

253.   AllianzGI had a duty to disclose these material omissions, because AllianzGI owed Lehigh duties of care and loyalty as the Managing Member and investment manager of the U.S. Fund, the Global Fund, and the Treasury Fund, which were funds in which Lehigh invested as a Non-Managing Member. Throughout their eleven-year relationship, Lehigh reposed trust in AllianzGI and AllianzGI accepted that trust, forming a fiduciary relationship, which required AllianzGI to make truthful disclosures of material information. Additionally, disclosure was required to correct

AllianzGI's misleading statements, and because AllianzGI had unique access to the withheld information.

254.    Allianz made these material misrepresentations or omitted to disclose the material facts with the intention of inducing Lehigh, in reliance thereon, to make additional investments in the Global Fund after March 2019, from which Allianz could earn additional incentive management fees.

255.    Lehigh reasonably and directly relied on the information and representations of Allianz, its long-time fiduciary, in deciding to purchase investments in the Global Fund. Lehigh could not have known that Allianz's representations were false or misleading until the Funds collapsed in the face of the 2020 market crash.

256.    Had Lehigh known that the information they received from Allianz contained material misrepresentations and omissions beginning from at least March 2019, Lehigh would not have made investments in the Global Fund on April 1, 2019, May 1, 2019 and November 1, 2019, in the aggregate amount of $25,000,000.

257.    Allianz's misrepresentations and omissions directly and proximately caused Lehigh's losses.  As described above, and as evidenced by the Funds' severe underperformance compared to the market and other similar funds, it was AllianzGI's undisclosed change in strategy that caused the vast majority of Lehigh's losses — and not the market decline in February and March 2020.

258.    Additionally, Allianz SE is vicariously liable for the damage caused to Lehigh by AllianzGI's fraud by the doctrine of respondeat superior.  AllianzGI's conduct was undertaken while carrying out its routine function as a portfolio manager.

259.    At all relevant times, AllianzGI and Allianz SE were in a principal-agent relationship by virtue of the unified corporate structure herein.  Among other things, Allianz SE indirectly owned 100% of AllianzGI, and Allianz SE had the power to influence and control and did influence and control the acts of AllianzGI.

260.    As a direct and proximate result of Defendants' material misrepresentations and omissions, Lehigh has lost a substantial portion of its investment in the Global Fund.  Lehigh is therefore entitled to damages in an amount to be determined at trial but in no event less than $12,422,199.60.

### COUNT II
### (Violation of Exchange Act § 20(a) Against Allianz SE)

261.    Lehigh repeats and realleges paragraphs 1 through 260 as if fully set forth herein.

262.    At all relevant times, Allianz SE owned and controlled AllianzGI, as fully alleged above.  Among other things, Allianz SE, as the parent company of the Allianz Group, marketed itself as an integrated financial conglomerate and: (a) was responsible for setting the business objectives and strategic direction for AllianzGI; (b) was responsible for setting the risk management framework for AllianzGI to ensure that "risks . . . are consistently identified, analyzed, assessed, and managed"; and (c) had a duty to "closely monitor the capital position and risk concentrations" of the Group and its related undertakings and "apply regular stress tests."  Additionally, AllianzGI's investment activities and risk management were subject to supervision by Allianz SE.

263.    Allianz SE culpably participated in AllianzGI's violations of Section 10(b) and Rule 10(b)-5.  Among other things, Allianz SE knew or should have known: (a) AllianzGI had altered its investment strategy so that it was no longer directionally

62

agnostic nor hedged in the way AllianzGI represented; (b) the undisclosed change in strategy rendered materially false AllianzGI's representations in the 2019 Quarterly Reports; (c) AllianzGI failed to monitor and disclose that the Funds had a higher downside risk and were more correlated to market swings than it had previously represented; (d) AllianzGI failed to conduct adequate stress tests and was therefore unprepared for a sustained market decline; and (e) that IDS failed to provide adequate risk reports to AllianzGI and Lehigh.

264.   Allianz SE had the opportunity and power to quash the fraud by discovering and disclosing the material misrepresentations and omissions by AllianzGI.

265.   By virtue of the foregoing, at the time of the wrongs alleged herein, Allianz SE had the ability to supervise and control the activities of AllianzGI, did in fact exercise such control, culpably participated in the primary violations of Section 10(b) and Rule 10b-5 alleged herein, and was therefore a controlling person of AllianzGI within the meaning of Section 20(a) of the Exchange Act.

266.   Lehigh has been damaged by the wrongful conduct of Allianz SE through its control of AllianzGI, in that Allianz SE's wrongful conduct caused Lehigh to purchase shares in the Global Fund in the aggregate amount of $25,000,000.

267.   Allianz SE's fraudulent conduct, through its control of AllianzGI, as alleged herein, was done purposefully or recklessly and without regard for the rights and interests of Lehigh.

268.   As a direct and proximate result of Allianz SE's misconduct, Lehigh has lost a substantial portion of its investment in the Global Fund.  Lehigh is therefore entitled to damages in an amount to be determined at trial but in no event less than

$12,422,199.60.

## COUNT III
### (Common Law Fraud Against AllianzGI and Allianz SE)

269.    Lehigh repeats and realleges paragraphs 1 through 268 as if fully set forth herein.

270.    AllianzGI intentionally or recklessly made false statements or omitted to disclose material facts, including, but not limited to, those described above.

271.    AllianzGI made these material misrepresentations or omitted to disclose the material facts with the intention of inducing Lehigh, in reliance thereon, to retain its existing investments in the U.S. Fund and the Global Fund as of March 2019 and to make additional investments in the Global Fund thereafter, from which AllianzGI could earn additional incentive management fees.

272.    Lehigh reasonably and directly relied on the information and representations of AllianzGI, its long-time fiduciary, and the information provided by IDS through AllianzGI in deciding to retain its existing investments in the U.S. Fund and the Global Fund as of March 2019 and to make additional investments in the Global Fund thereafter.  Lehigh could not have known that AllianzGI's representations were false or misleading until the Funds collapsed in the face of the 2020 market downturn.

273.    Had Lehigh known that that the information they received from AllianzGI contained material misrepresentations and omissions beginning from at least March 2019, Lehigh would have redeemed its existing investments in the U.S. Fund and the Global Fund at that time, and would not have invested an additional $25,000,000 in the Global Fund on April 1, 2019, May 1, 2019 and November 1, 2019.

274.    Allianz's misrepresentations and omissions directly and proximately caused Lehigh's losses.  As described above, and as evidenced by the Funds' severe underperformance compared to the market and other similar funds, it was AllianzGI's undisclosed change in strategy that caused the vast majority of Lehigh's losses — and not the market decline in February and March 2020.

275.    Additionally, Allianz SE is vicariously liable for the damage caused to Lehigh by AllianzGI's fraud by the doctrine of respondeat superior.  AllianzGI's conduct was undertaken while carrying out its routine function as a portfolio manager.

276.    At all relevant times, AllianzGI and Allianz SE were in a principal-agent relationship by virtue of the unified corporate structure alleged above at paragraphs 24-38.  Among other things, Allianz SE indirectly owned 100% of AllianzGI, and Allianz SE had the power to influence and control and did influence and control the acts of AllianzGI.

277.    As a direct and proximate result of Defendants' material misrepresentations or omissions, Lehigh has lost a substantial portion of its investment in the Funds.  Lehigh is therefore entitled to damages in an amount to be determined at trial but in no event less than $62.5 million.

## COUNT IV
### (Negligent Misrepresentation Against AllianzGI and Allianz SE)

278.    Lehigh repeats and realleges paragraphs 1 through 277 as if fully set forth herein.

279.    AllianzGI owed Lehigh duties of care and loyalty, because it is the Managing Member and investment manager of the U.S. Fund, the Global Fund, and the Treasury Fund, which were funds in which Lehigh invested as a Non-Managing Member.

Throughout their eleven-year relationship, Lehigh reposed trust in AllianzGI and AllianzGI accepted that trust, forming a fiduciary relationship.

280.    AllianzGI acted negligently and carelessly in making the material misrepresentations and omissions, as fully described above.

281.    AllianzGI made these material misrepresentations and omissions knowing that Lehigh would use and rely upon them in deciding whether to retain its existing investments in the U.S. Fund and the Global Fund as of April 2019 and to make additional investments in the Global Fund thereafter.

282.    Lehigh reasonably and directly relied on the information and representations of AllianzGI, its long-time fiduciary, in deciding to retain its existing investments in the U.S. Fund and the Global Fund as of March 2019 and to make additional investments in the Global Fund thereafter.  Lehigh could not have known that AllianzGI's representations were false or misleading until the Funds collapsed in the face of the 2020 market crash.

283.    Had Lehigh known that the information they received from AllianzGI contained material misrepresentations and omissions beginning from at least March 2019, Lehigh would have redeemed its existing investments in the U.S. Fund and the Global Fund at that time, and would not have invested an additional $25,000,000 in the Global Fund on April 1, 2019, May 1, 2019 and November 1, 2019.

284.    Allianz's misrepresentations and omissions directly and proximately caused Lehigh's losses.  As described above, and as evidenced by the Funds' severe underperformance compared to the market and other similar funds, it was AllianzGI's

undisclosed change in strategy that caused the vast majority of Lehigh's losses – and not the market decline in February and March 2020.

285.    Additionally, Allianz SE is vicariously liable for the damage caused to Lehigh by AllianzGI's actions by the doctrine of respondeat superior.  AllianzGI's conduct was undertaken while carrying out its routine function as a portfolio manager.

286.    At all relevant times, AllianzGI and Allianz SE were in a principal-agent relationship by virtue of the unified corporate structure alleged above at paragraphs 24-38.  Among other things, Allianz SE indirectly owned 100% of AllianzGI, and Allianz SE had the power to influence and control and did influence and control the acts of AllianzGI.

287.    As a direct and proximate result of AllianzGI's material misrepresentations or omissions, Lehigh has lost a substantial portion of its investment in the Funds.  Lehigh is therefore entitled to damages in an amount to be determined at trial but in no event less than $62.5 million.

**COUNT V**
**(Breach of Fiduciary Duty)**

288.    Lehigh repeats and realleges paragraphs 1 through 287 as if fully set forth herein.

289.    Lehigh reposed trust in AllianzGI and AllianzGI accepted that trust, forming a fiduciary relationship.  Moreover, AllianzGI, as the Managing Member and investment manager of the U.S. Fund and the Global Fund, directly owed the highest duties of care and loyalty to Lehigh, a Non-Managing Member.  These duties have not been disclaimed or modified under the LLC Agreements.  AllianzGI further owed direct fiduciary duties to Lehigh, because (a) Lehigh directly paid AllianzGI fees from its

67

capital accounts to manage its investments in the Funds and (b) AllianzGI was appointed as Lehigh's lawful representative and attorney-in-fact pursuant to Section 8.02 of the LLC Agreements.

290.    Additionally, AllianzGI, as a discretionary investment advisor registered with the SEC, owed professional duties of care to its client Lehigh, irrespective of any contractual duties, to exercise that degree of skill normally expected of investment advisers performing advisory services of the nature provided here.

291.    AllianzGI breached its fiduciary duty to truthfully disclose material information to Lehigh by intentionally, recklessly, or negligently misrepresenting (i) its investment strategy, (ii) the risk profile of the Funds, (iii) Allianz's risk management procedures, and (iv) failing or omitting to disclose the Funds' change in strategy, when it had a duty to do so as fully described above.

292.    AllianzGI also breached its fiduciary duty of care to Lehigh by mismanaging the Funds.  Among other things: (a) AllianzGI changed its investment strategy to no longer be directionally-neutral by April 2019; (b) AllianzGI purchased an insufficient quantity and quality of long put options to adequately hedge its risks; and (c) AllianzGI failed to adequately model and stress test for a market scenario similar to those present during the 2020 market downturn.

293.    As a result of AllianzGI's mismanagement, the Funds' value declined by nearly 19% in February 2020, when the market first began to drop due to COVID-19.

294.    After this initial decline, in March 2020 AllianzGI continued to make admittedly "major tactical errors," in breach of its duty of care, including, among other things: (a) failing to close out options positions pursuant to the stop-loss method; (b)

selling significant amounts of its protective long put options to extend short put contracts and respond to margin calls; and (c) abandoning its systematic strategy in favor of an ad hoc bet on the market's direction.

295.   AllianzGI's misconduct in March 2020 was also a self-interested effort to boost its management fee and recoup the February 2020 losses prior to the end of the quarter and, therefore, constitutes a breach of its duty of loyalty.

296.   AllianzGI's breaches of fiduciary duty caused the U.S. Fund and the Global Fund to decline by more than 75% in the first quarter of 2020, as made evident by the fact that their respective market reference indexes, the S&P 500 and the MSCI ACWI, declined by only 20% and 13.9% during the same period.  The Funds thus significantly underperformed their respective market indexes and AllianzGI's projected tracking error of 3% to 5%.

297.   AllianzGI's conduct was purposeful and departed in the extreme from the norms expected of an experienced investment manager.

298.   Additionally, Allianz SE is vicariously liable for the damage caused to Lehigh by AllianzGI's actions by the doctrine of respondeat superior.  AllianzGI's conduct was undertaken while carrying out its routine function as a portfolio manager.

299.   At all relevant times, AllianzGI and Allianz SE were in a principal-agent relationship by virtue of the unified corporate structure alleged above.  Among other things, Allianz SE indirectly owned 100% of AllianzGI, and Allianz SE had the power to influence and control and did influence and control the acts of AllianzGI.

300.   As a direct and proximate result of AllianzGI's breaches of fiduciary duty, Lehigh has lost a substantial portion of its investment in the Funds.  Lehigh is therefore

entitled to damages in an amount to be determined at trial but in no event less than $62.5 million.

## COUNT VI
### (Negligence)

301.    Lehigh repeats and realleges paragraphs 1 through 300 as if fully set forth herein.

302.    AllianzGI, as the Managing Member and investment manager of the U.S. Fund and the Global Fund, directly owed the highest duties of care and loyalty to Lehigh, a Non-Managing Member.  These duties have not been disclaimed or modified under the LLC Agreements.  AllianzGI further owes direct fiduciary duties to Lehigh, because Lehigh directly paid AllianzGI fees from its capital accounts to manage its investments in the Funds.

303.    Additionally, AllianzGI, as a discretionary investment advisor registered with the SEC, owed professional duties of care to its client Lehigh, irrespective of any contractual duties, to exercise that degree of skill normally expected of investment advisers performing advisory services of the nature provided here.

304.    Lehigh reasonably and foreseeably relied on AllianzGI to exercise such care as ordinarily exercised by an experienced investment manager in managing the Funds.

305.    AllianzGI failed to act as a reasonably prudent investment manager by mismanaging the Funds in the manner described above, including but not limited to: (a) gambling that the market would improve in February and March 2020 notwithstanding its own representations that it would not undertake such risk and notwithstanding the warnings of Allianz SE's chief economist; (b) purchasing an insufficient quantity and

quality of long put options to adequately hedge its risks; and (c) failing to adequately model and stress test for a market scenario similar to those present during the 2020 market downturn

306.    In addition to the misrepresentations that caused Lehigh to invest and retain its investments in the Funds and therefore lose approximately 75% of its investment in the Funds, AllianzGI's negligent mismanagement caused the U.S. Fund and the Global Fund to decline by more than 75% in the first quarter of 2020, which resulted in Lehigh losing a substantial portion of its investment.

307.    Pursuant to Section 2.06 of the LLC Agreements governing the Funds AllianzGI is not exculpated from liability caused by negligent conduct.

308.    Additionally, Allianz SE is vicariously liable for the damage caused to Lehigh by AllianzGI's actions by the doctrine of respondeat superior.  AllianzGI's conduct was undertaken while carrying out its routine function as a portfolio manager.

309.    At all relevant times, AllianzGI and Allianz SE were in a principal-agent relationship by virtue of the unified corporate structure alleged above at paragraphs 24-38.  Among other things, Allianz SE indirectly owned 100% of AllianzGI, and Allianz SE had the power to influence and control and did influence and control the acts of AllianzGI.

310.    As a direct and proximate result of AllianzGI's negligence, Lehigh has lost a substantial portion of its investment in the Funds.  Lehigh is therefore entitled to damages in an amount to be determined at trial but in no event less than $62.5 million.

## COUNT VII
### (Breach of the Implied Covenant
### of Good Faith and Fair Dealing)

311.   Lehigh repeats and realleges paragraphs 1 through 310 as if fully set forth herein.

312.   The LLC Agreements are valid contracts, to which AllianzGI and Lehigh are parties.

313.   The covenant of good faith and fair dealing is an implied term of the LLC Agreements.  Pursuant to Section 2.06 of the LLC Agreements, AllianzGI is not exculpated from liability caused by bad faith conduct.

314.   Pursuant to Section 1.07 of the LLC Agreements, the Funds were "organized for the purposes of investment of the assets contributed to the [Funds]."

315.   Pursuant to Section 8.20 of the LLC Agreements, the LLC Agreements are to be read in conjunction with the PPMs, which further provide that the investment objective of the U.S. Fund and the Global Fund is to respectively outperform the S&P 500 and the MSCI ACWI by approximately 5%, net of fees and expenses.

316.   Pursuant to Sections 2.03 of the LLC Agreements, AllianzGI, as investment manager, had a duty to make investment decisions in furtherance of the Funds' investment objective.

317.   To the extent that AllianzGI had discretion under the LLC Agreements in its investment decisions, AllianzGI exercised that discretion unreasonably and in bad faith by, among other things: (a) adjusting its investment strategy, without informing Lehigh, to no longer be directionally-neutral; (b) purchasing insufficient long put options to adequately hedge the Funds' risks; and (c) failing to conduct adequate risk assessments

for different market scenarios and that take into account AllianzGI's actual investment strategies.

318.   Furthermore, in response to the market downturn in the first quarter of 2020, AllianzGI failed to take steps to mitigate the damage done by its changed investment strategy and instead doubled-down on its bet, gambling that the market and the VIX would recover quickly.  Accordingly, AllianzGI also exercised its discretion unreasonably and in bad faith by, among other things: (a) failing to close out options positions pursuant to the stop-loss method; (b) selling significant amounts of its protective long put options to extend short put contracts and respond to margin calls; and (c) abandoning its systematic strategy in favor of an ad hoc bet on the market's direction. In doing so, AllianzGI frustrated the fruits of the bargain that Lehigh reasonably expected.

319.   AllianzGI's unreasonable and bad faith exercise of discretion caused the Funds to lose more than 75% of their value in the first quarter of 2020, thereby frustrating the Funds' express investment objectives and Lehigh's reasonable expectations for modest returns on its investments with substantial downside protection.

320.   AllianzGI has therefore breached the implied covenant of good faith and fair dealing.

321.   Additionally, Allianz SE is vicariously liable for the damage caused to Lehigh by AllianzGI's actions by the doctrine of respondeat superior.  AllianzGI's conduct was undertaken while carrying out its routine function as a portfolio manager.

322.   At all relevant times, AllianzGI and Allianz SE were in a principal-agent relationship by virtue of the unified corporate structure alleged above.  Among other

things, Allianz SE indirectly owned 100% of AllianzGI, and Allianz SE had the power to influence and control and did influence and control the acts of AllianzGI.

323.    As a direct and proximate result of AllianzGI's breaches of the contracts' implied covenant of good faith and fair dealing, Lehigh has lost a substantial portion of its investment in the Funds.  Lehigh is therefore entitled to damages in an amount to be determined at trial but in no event less than $62.5 million.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Lehigh demands judgment against AllianzGI awarding:

1.      Damages to Lehigh in an amount to be determined at trial but in no event less than $62.5 million;

2.      Interest on any award at the appropriate statutory rate; and

3.      Such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury as to all issues so triable.


Dated:  August 31, 2020

SCHINDLER COHEN & HOCHMAN LLP

By:  /s/ Jonathan L. Hochman
        Jonathan L. Hochman
        Matthew A. Katz
        Jenny C. Gu
100 Wall Street, 15th Floor
New York, NY 10005
(212) 277-6300
(212) 277-6333 (fax)